# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
February 21, 2018 Session

## KISHA DEAN TREZEVANT v. STANLEY H. TREZEVANT, III

### Direct Appeal from the Circuit Court for Shelby County
### No. CT-003516-13     Donna M. Fields, Judge

---

### No. W2017-00715-COA-R3-CV

---

This is a divorce case between parties who amassed a great amount of wealth and lived an extravagant lifestyle for many years. There are no minor children involved, and this appeal is limited to the trial court's identification, classification, valuation, and division of marital property, the trial court's awards of alimony to Wife, and Husband's convictions for several counts of criminal contempt. One of the most salient issues raised by Husband on appeal relates to the trial court's decision to use a financial statement prepared by Husband in 2012 to value several properties in the marital estate rather than the certified appraisals that were prepared in the course of litigation for the purpose of valuing the marital estate. According to Husband, this resulted in the court grossly over-valuing the marital estate. For the reasons stated herein, we affirm the trial court's identification and classification of marital property as well as the trial court's findings and sentencing related to Husband's criminal contempt. We vacate the trial court's valuation and distribution of the parties' marital property and awards of alimony. We remand the case to the trial court for further proceedings consistent with this Opinion.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in part, Vacated in part, and Remanded

BRANDON O. GIBSON, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR, P.J., M.S., and J. STEVEN STAFFORD, P.J., W.S., joined.

Donald N. Capparella, Nashville, Tennessee, for the appellant, Stanley H. Trezevant, III.

Mitchell David Moskovitz and Adam Noah Cohen, Memphis, Tennessee, for the appellee, Kisha Dean Trezevant.

# OPINION

## I. FACTS & PROCEDURAL HISTORY

Stanley H. Trezevant, III[1] ("Husband") and Kisha Dean Trezevant ("Wife") were married in September 1990. Two daughters were born of the marriage, both of whom reached the age of majority before this case went to trial. Husband has a degree in business management from the University of Memphis and has been an extremely successful real estate entrepreneur throughout the parties' marriage. Wife obtained a GED at age seventeen and earned a degree in creative literature during the parties' marriage. Wife assisted Husband to some extent with his business ventures, but she did not otherwise work outside the home.

On August 15, 2013, Wife filed for divorce, alleging irreconcilable differences and that Husband was guilty of inappropriate marital conduct. In her complaint for divorce, Wife sought a divorce from Husband, a division of the marital estate, and awards of alimony, attorney's fees, and suit expenses.[2] Husband filed an answer and a counter-complaint for divorce against Wife on February 21, 2014, agreeing that the parties should be divorced based on irreconcilable differences, but denying his own marital misconduct and alleging that Wife was the party guilty of inappropriate marital conduct.

Throughout the marriage, Husband was very successful at his work, and the parties amassed a tremendous estate. By virtue of this success, the parties enjoyed an extravagant lifestyle. The marital residence consisted of a 10,500 square foot home containing six bedrooms, nine bathrooms, and a five car garage. In addition to their principal residence in Shelby County, Tennessee, the parties also maintained several vacation homes during their marriage, including properties in the Cayman Islands, an expansive lake home, and a home in Oxford, Mississippi. The parties took expensive international trips to destinations such as France, Spain, Greece, the Cayman Islands, and Jamaica. The family also enjoyed other trips to the U.S. Open, the Grammy Awards, West Palm Beach for diamond shopping, and Miami and New York to shop for clothing. Husband and Wife were members of sporting and social clubs in Memphis. The family drove luxury vehicles such as Range Rovers, Land Rovers, Mercedes Benz convertibles, and others.

The material possessions amassed by the parties are the impetus for both the protraction of the proceedings below as well as for this appeal. As stated previously,

---

[1] Husband is also known as "Trip" Trezevant.
[2] In Wife's Complaint, she also initially sought to be named the primary residential parent of the parties' daughter who was still seventeen years old at the time. That daughter, however, turned eighteen during the pendency of this matter, and the parenting issues thereafter became moot.

Husband is in the real estate business. He established Trezevant Enterprises, Inc., which became a real estate management, development, and maintenance company and also does construction and leasing. The marital estate included approximately 49 commercial and residential properties. The procedural history of this case is littered with volumes upon volumes of pleadings, transcripts, and exhibits designed to identify, value, and/or distribute the parties' wealth. Among other things, the sheer size of the parties' estate, the complexities involved in valuing commercial property, including international property, and what the trial court found to be Husband's deliberate attempts to hide assets, contributed to the convoluted process of identifying, classifying, valuing, and distributing the parties' marital estate in this case. The trial court eventually determined the gross value of the marital estate, excluding personal property, trusts, and not accounting for debt, to be $44,339,611.00.

During the pendency of the divorce, the parties engaged in a lengthy seven-day hearing before a divorce referee regarding pendente lite support for Wife. The divorce referee ordered, and the trial court affirmed, that Husband should pay Wife $20,000.00 per month in pendente lite support. Also prior to the trial of this matter, the trial court held a separate hearing on issues related to Wife's separate property. During the marriage, Husband gave Wife several checks totaling $4,221,000.00. Wife claimed that this money was a gift to her from Husband and, therefore, her separate property. The trial court agreed.

The actual divorce trial was held on September 12, 13, 14, 15, 16, and October 13 and 14, 2016. The trial court issued an oral ruling from the bench on December 16, 2016. Thereafter, the court conducted additional hearings to settle disputes over the final decree of divorce. The final decree was entered on March 1, 2017 ("Final Decree"). In the Final Decree, the trial court reaffirmed its previous ruling regarding Wife's separate property. The court denied Husband's claims that certain assets were separate property. The court declared the parties divorced pursuant to Tennessee Code Annotated section 36-4-129, with both parties acknowledging post-separation marital fault.

Two appraisers testified at trial – Todd Glidewell and Rip Walker – regarding twenty of the more valuable properties in the marital estate. Wife did not object to Mr. Glidewell or Mr. Walker's appraisals or their testimony, nor did she provide competing appraisals or expert testimony. She simply relied on values of the property listed on a financial statement created by Husband in 2012, which generally valued the properties much higher than the appraisals. According to Husband, Wife chose the appraisers and then right before trial decided to rely on Husband's 2012 Financial Statement for the value of several of the parties' properties – particularly those properties that she requested the court distribute to Husband. In the Final Decree, the trial court divided the marital estate by creating a list of the marital assets, assigning the court's determination

of that asset's fair market value less the debt on the property, and stating whether each asset was awarded to Husband or Wife. Husband complains that the court gave Wife the properties with the un-inflated values. The parties did not dispute the amount of debt on the properties. Therefore, according to Husband, because the trial court used inflated values from the 2012 Financial Statement for many of the properties awarded to him, Husband asserts that the court overvalued the property given to him in the divorce by more than $24 million. To help balance the division of the marital estate, which was divided $34,204,026.00 to Husband and $10,135,585.00 to Wife, the trial court awarded Wife $7,500,00.00 in alimony in solido.

The trial court also found that Husband dissipated marital assets by transferring $2,145,131.00 to his attorney and friend, Norman Klein, in the Cayman Islands. Husband contended that Mr. Klein was his business partner in a real estate transaction and that he was simply reimbursing Mr. Klein for his portion of the sale of some real estate. Wife suggested that Mr. Klein was holding the money for Husband until the divorce was over. The trial court agreed with Wife and found that Wife's portion of these funds would have been $1,072,565.50. Apparently, rather than requiring Husband to reimburse Wife for this amount, the court decided that this amount would operate to "offset" the sum of money the court had determined to be Wife's separate property.

Wife claimed at trial that her monthly expenses amounted to $32,132.00, and that this was a reduced amount from what she was accustomed to spending. The trial court awarded Wife alimony in futuro in the amount of $25,000.00 per month for the first 72 months following the Final Decree, and $20,000.00 per month for each month thereafter. Husband was also ordered to pay $464,890.92, which represented one half of Wife's attorney's fees.

Another main issue in this case was Husband's multiple counts of criminal contempt. On September 19, 2014, the trial court entered a consent order granting Wife's petition for civil and criminal contempt against Husband. Therein, Husband agreed that he was in criminal contempt for executing an option and sale agreement for Unit 305 of the Kisha Condominium complex in the Cayman Islands. He also agreed that he was in civil contempt for failing to comply with the divorce referee's order and agreed to make purge payments in the amount of $290,000.00 and to pay a portion of Wife's attorney's fees. On June 29, June 30, and July 1, 2015, the trial court held a hearing on the pending matters related to additional petitions for contempt filed by Wife. The court again found Husband guilty of criminal contempt for failing to abide by court orders related to turning over sums of money, and he was incarcerated on July 1, 2015. Husband was released on July 6, 2015, and ordered to make a purge payment to Wife.

Wife filed another petition for civil and criminal contempt against Husband on

4

October 14, 2015.  This petition was tried in the final divorce trial, and the results thereof are the subject of Husband's appeal in this matter.  In this petition, Wife generally asserted that Husband had been hiding assets and manipulating appraisals of the marital properties.  According to Wife, Husband was deliberately trying to deceive Wife and the court as to the value of the marital estate.  Wife again filed a petition on March 30, 2016, alleging that Husband was engaging in additional contemptuous activity, including lying to Wife and the court about his financial status and the amount of property taxes owed on the parties' property.  In the Final Decree, the trial court found Husband guilty of nineteen separate additional counts of criminal contempt.  He was ordered to serve 55 days in jail.  This sentence has been stayed pending appeal.

Husband timely filed a notice of appeal on March 31, 2017.

## II.  ISSUES PRESENTED

Husband presents the following issues for review on appeal:

1.     Whether the trial court erred in finding Trip's Nurseries and the Nonconnah properties were marital property, and for failing to order Wife to return Husband's separate silver collection and account for the marital silver she took?

2.     Whether the trial court erred when it found $4,221,000 of cash transfers of marital property to Wife by Husband were gifts and therefore Wife's separate property?

3.     Whether the trial court erred in finding dissipation of funds in Husband's transactions with Norman Klein where (1) Wife introduced no proof of dissipation, and (2) the proof overwhelmingly showed that Husband and Norman Klein had a 50/50 partnership with respect to the Cayman Island property that they sold?

4.     Whether the evidence preponderates against the trial court's valuation of Husband's share of the marital estate where it over-valued Husband's share by relying on an unsigned, unsworn, unaudited 4.5 year old financial statement, rejecting the only expert proof in this case based upon a great many far more recent certified property appraisals?

5.     Whether the awards of alimony in solido and alimony in futuro should be reversed where (1) the division of marital property must

5

be reversed because of the gross over-valuation of Husband's share of the marital estate, (2) the trial court failed to consider the reduction in Husband's ability to pay having lost the substantial income from marital properties given to Wife, (3) the trial court failed to consider the change in Wife's need based upon the income from the property she received, and (4) Wife was found by the trial court to have over $4.2 Million in separate property?

6. Whether the trial court's award of $464,890.92 in attorney's fees as alimony in solido should be reversed where (1) the division of marital property should be reversed, and (2) Wife did not lack sufficient funds to pay her own attorneys?

7. Whether the trial court should reverse criminal contempt counts against Husband where (1) the court failed to follow the requirements for proper sentencing, and (2) there was not proof of criminal contempt beyond a reasonable doubt?

Wife presents the following additional issue, as restated, on appeal:

8. Whether Wife is entitled to her attorney's fees incurred on appeal.

### III. DISCUSSION

This case was tried by the trial court without a jury. We therefore review the trial court's findings of fact *de novo* with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013). Also, because the trial court has the opportunity to observe the demeanor of the witnesses and hear the in-court testimony, we afford considerable deference to the trial court's credibility determinations and the weight given to oral testimony.[3] *Andrews v. Andrews*, 344 S.W.3d 321, 339 (Tenn. Ct. App. 2010). We review the trial court's conclusions of law *de novo* with no presumption of correctness. *Hyneman v. Hyneman*, 152 S.W.3d 549, 553 (Tenn. Ct. App. 2003).

We address Husband's issues on appeal in a different order than he presented them in his brief. The process for disposition of marital property in a divorce is (1) identification of the parties' property, (2) classification of the parties' property as marital or separate property, (3) valuation of the property, (4) distribution of the property, and then a determination of whether an award of spousal support is warranted may follow. *See Keyt v. Keyt*, 244 S.W.3d 321, 328 (Tenn. 2007) (noting that "[b]ecause the courts do

---

[3]Of particular importance in this case, the trial court found Husband to have zero credibility.

not have the authority to make an equitable distribution of separate property, whether separate property should be considered as marital is a threshold matter."). "Once property has been classified as marital property, the court should place a reasonable value on property that is subject to division." *Luplow v. Luplow*, 450 S.W.3d 105, 109 (Tenn. Ct. App. 2014) (citing *Edmisten v. Edmisten*, No. M2001-00081-COA-R3-CV, 2003 WL 21077990, at *11 (Tenn. Ct. App. May 13, 2003)). After this valuation, the trial court is to divide the marital property in an equitable manner considering the statutory factors listed in Tennessee Code Annotated section 36-4-121(c). *Luplow*, 450 S.W.3d at 109-110. "The equitable division of marital property is a fact-intensive inquiry involving the careful weighing of the relevant statutory factors." *Brainerd v. Brainerd*, No. M2015-00362-COA-R3-CV, 2016 WL 6996365, at *5 (Tenn. Ct. App. Nov. 30, 2016) (*no perm. app. filed*). The trial court has broad discretion in fashioning an equitable distribution of marital property, and an appellate court will defer to the trial court's distribution unless it is inconsistent with the statutory factors or lacks proper evidentiary support. *Baggett v. Baggett*, 422 S.W.3d 537, 543 (Tenn. Ct. App. 2013).

### 1. Classification of Marital vs. Separate Property

We begin our analysis with Husband's allegations of error related to the classification of the parties' property as either marital or separate property. The definition of "marital property" includes the following:

> "Marital property" means all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of the filing of a complaint for divorce, except in the case of fraudulent conveyance in anticipation of filing, and including any property to which a right was acquired up to the date of the final divorce hearing, and valued as of a date as near as reasonably possible to the final divorce hearing date.

Tenn. Code Ann. § 36-4-121(b)(1)(A). A party's separate property, on the other hand, includes the following:

> "Separate property" means:
>
> (A) All real and personal property owned by a spouse before marriage . . . ;
>
> (B) Property acquired in exchange for property acquired before the marriage;

7

(C)  Income from and appreciation of property owned by a spouse before marriage except when characterized as marital property under subdivision (b)(1);

(D)  Property acquired by a spouse at any time by gift, bequest, devise or descent;

(E)  Pain and suffering awards . . . ;

(F)  Property acquired by a spouse after an order of legal separation

Tenn. Code Ann. § 36-4-121(b)(2)(A)-(F).  The determination of what is marital and what is separate property pursuant to Tennessee Code Annotated section 36-4-121 is a question of fact. *Luplow*, 450 S.W.3d at 109.  The trial court's classification of marital property is, therefore, subject to the trial court's sound discretion and will be given great weight on appeal. *Dunlap v. Dunlap,* 996 S.W.2d 803, 814 (Tenn. Ct. App. 1998) (citing *Harris v. Corley*, No. 01A01-9011-CH-00415, 1991 WL 66447, at *5 (Tenn. App. May 1, 1991)).  "In accordance with rule 13(d) of the Tennessee Rules of Appellate Procedure, the trial court's classification and division of marital property enjoys a presumption of correctness and will be reversed or modified only if the evidence preponderates against the court's decision." *Id.*

## A.    Trip's Nurseries

Husband first asserts that the trial court erred in finding that the Trip's Nurseries business was marital property rather than his own separate property.  According to Husband, he started and owned Trip's Nurseries before the marriage, and he argues that there is nothing in the record to support the theory that these assets were transmuted during the marriage.  At trial, Husband testified that, after college, he worked doing landscaping and commercial property maintenance services and started the Trip's Nurseries business in 1980, which was ten years prior to his marriage to Wife.  To the contrary, Wife contends that Trip's Nurseries was purchased long after the parties were married and that Husband did not meet his burden of proving that this was his separate property.  Moreover, Wife contends that Husband actually abandoned this argument at trial.

On the issue of whether Trip's Nurseries was marital or separate property, the trial court found as follows:

Husband contended in his Rule 14 filings[4], and at trial, that a number of

---

[4]Rule 14 of the Local Rules of Practice for Shelby County, Tennessee pertains to "domestic relations

Trip's Nursery's assets were his separate property. Those were as follows: Two (2) 2001 Chevy Vans; 2012 Land Rover; New Holland Tractor; 2004 Ford F450; 2002 Ford F250; Inventory; and Tools.

It is clear from Husband's very description of the assets in question that they were acquired during the marriage. Moreover . . . Husband testified at trial that he sold the Trip's Nurseries business in 1998, during the marriage. He later claimed to reacquire the business during the marriage. Husband did not trace any funds from separate property to evidence reacquisition of the Nursery. However, the Court has awarded Trip's Nursery business to Mr. Trezevant.

---

cases." In a case such as the one at hand, Rule 14(C) requires the parties to a contested divorce in which alimony is an issue to file

> no later than ninety (90) days before trial, a sworn statement setting forth the party's income, a list of expenses, and a description and valuation (or estimate) of real and/or personal property possessed in any form, the state of its title, and the party's claimed interest in such property. The sworn statement must also include, if known, or if the information is reasonably procurable, the income and property interest of the opposing party, both real and personal, and the valuation thereof. Any changes in the statement while the case is pending must be disclosed as soon as possible, and not later than ten (10) days before the trial.

Local Rules of Practice for Shelby Co., Tenn., Rule 14(C)(1). Subsection (D) of Rule 14 requires counsel for parties in a contested divorce case to deliver to the trial judge a memorandum at least twenty-four (24) hours before the trial that includes:

> (a) Certification that the party's Rule Fourteen (C) affidavit of income and expenses has been filed.
> (b) Whether the client seeks a divorce, legal separation, separate maintenance or to remain married.
> (c) Whether grounds can be stipulated to avoid proof. (T.C.A. § 36-4-129).
> . . . .
> (h) Proposed disposition of the marital residence.
> (i) Fair market value of the marital residence and amount of mortgage.
> (j) Proposed disposition of any other real property and its fair market values.
> (k) Proposed division of debts.
> (l) Specific items of personalty sought, and its value.
> (m) The amount and type of alimony sought.
> (n) The amount of attorney's fee sought.
> (o) Certification that the above written proposals were submitted to opposing counsel at least 24 hours before the trial.

Local Rules of Practice for Shelby Co., Tenn., Rule 14(D).

9

Husband failed to meet his burden of proving that these particular assets were acquired with separate funds. Moreover, to the extent that Husband ever truly had a separate property interest in any portion of these assets, same has been transmuted into marital property. As set forth in more detail above, all of the various properties owned by the parties feed into and comprise Trezevant Enterprises, Inc., Trip's Nursery. Based upon all of the foregoing, all of the "Trip's Nursery" assets that Husband claimed were his separate property are, in fact, marital property.

(Internal citations omitted.)

Because Tennessee Code Annotated section 36-4-121(b)(1)(A) defines marital property as "all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage," when Trip's Nurseries was acquired is of specific import. If acquired during the marriage, the business and its assets would presumptively be classified as marital property. Husband asserts that the trial court incorrectly found that he sold Trip's Nurseries in <u>1998</u>, which would have been during the parties' marriage. According to Husband, he actually sold Trip's Nurseries in <u>1988</u> and reacquired it in early 1990 before his marriage to Wife in September 1990. He therefore also disputes the trial court's finding that he claimed to have reacquired Trip's Nurseries during the marriage. Finally, Husband argues that the trial court's finding that any of his separate property had been transmuted is merely conclusory and that there are insufficient factual findings to support that theory.

Our review of the voluminous record confirms Husband's assertion that he testified at trial that he sold the business of Trip's Nurseries to a group of investors in 1988, rather than 1998. However, he does not make a convincing argument on appeal for this Court to reverse the trial court's finding that Trip's Nurseries is marital property. We conclude that the evidence does not preponderate against the trial court's decision to classify Trip's Nurseries as marital property. Although Husband testified that he reacquired some interest in the business of Trip's Nurseries before the marriage, Wife presented evidence that two of the properties owned by Trip's Nurseries that Husband asserted were his separate property, 7038 Poplar Avenue and 6993 Poplar Avenue, were purchased long after the parties were married. Husband, therefore, had the burden of proving that this was his separate property, and the record is sparse at best on Husband's efforts to establish this or trace Trip's Nurseries' current assets to his separate property.

Husband also argues that the trial court erred in concluding that if Trip's Nurseries was ever his separate property, it had been converted into marital property by virtue of transmutation.

[S]eparate property may be converted into marital property by commingling or transmutation. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 747 (Tenn. 2002). Our supreme court has explained how the doctrines of commingling and transmutation work:

> [S]eparate property becomes marital property [by commingling] if inextricably mingled with marital property or with the separate property of the other spouse. If the separate property continues to be segregated or can be traced into its product, commingling does not occur. . . . [Transmutation] occurs when separate property is treated in such a way as to give evidence of an intention that it become marital property. . . . The rationale underlying these doctrines is that dealing with property in these ways creates a rebuttable presumption of a gift to the marital estate. This presumption is based also upon the provision in many marital property statutes that property acquired during the marriage is presumed to be marital. The presumption can be rebutted by evidence of circumstances or communications clearly indicating an intent that the property remain separate.

*Cox v. Cox*, No. E2016-01097-COA-R3-CV, 2017 WL 6517596, at *4 (Tenn. Ct. App. Dec. 20, 2017) (*no perm. app. filed*) (quoting *Langschmidt*, 81 S.W.3d at 747 (alteration in original) (quoting 2 Homer H. Clark, *The Law of Domestic Relations in the United States* § 16.2 at 185 (2d ed. 1987)). There is sufficient evidence in the record to support the trial court's conclusion of transmutation of any of Trip's Nurseries that might have ever been his separate property. Marital funds were used to purchase the later-acquired properties that comprised Trip's Nurseries, and all of the various properties owned by the parties appear to have been under the umbrella of Trezevant Enterprises, Inc., which was a marital asset. Trip's Nurseries, like the parties' other commercial properties, was held out as the parties' joint property. "An asset separately owned by one spouse will be classified as marital property if the parties themselves treated it as marital property." *Fox v. Fox*, No. M. 2004-02616-COA-R3-CV, 2006 WL 2535407, at *5 (Tenn. Ct. App. Sept. 1, 2006).

## B.    Nonconnah Properties

At trial, Husband argued that the following five properties, referred to as the "Nonconnah Properties," were his separate property:

        I.    0 Cherry Road

6.33 acres

Memphis, TN

Titled: American Sign Co., GP

. . . .

II.  0 Goodlett

Memphis, TN 38118

3.09 acres (vacant land)

Titled: Stanley H. Trezevant, III

. . . .

III.  0 Goodlett

Memphis, TN 38118

2.041 acres (vacant land)

Titled: Stanley H. Trezevant, III

. . . .

IV.  0 Nonconnah Circle

Memphis, TN 38118

7.337 acres (vacant land)

Titled: Stanley H. Trezevant, III

. . . .

V.  Vacant land near Perkins & I-240

Memphis, TN 38118

21.386 acres (vacant land)

Titled: Stanley H. Trezevant, III


The trial court rejected Husband's contention that these were his separate properties, finding the Nonconnah Properties to be part of the marital estate:

Husband and each of his two (2) siblings inherited a 33.33% interest in the "Nonconnah Properties" in 2007. Because these properties were "worthless," Husband purchased brother and sister's interests in the Nonconnah properties. The Quitclaim Deeds expressly reflect that, in 2011 and 2012, Husband paid consideration to his brother and sister for the remaining 66.67% of these properties.

. . . .

There is no question that all of the equity in and to these Nonconnah properties is all marital property. There is no dispute that, during the marriage, the parties paid taxes on these properties with marital funds. . . . Since, by Husband's own admission, these properties were worthless when Husband inherited and/or later purchased his interest in and to same, the entire current values of the properties are marital property.

This Honorable Court likewise finds that any portion of this real estate itself that may have, at one time, been classified as Husband's separate property has since been transmuted into marital property.

. . . .

In the present case, all of the various properties owned by the parties feed into and comprise Trezevant Enterprises, Inc. (hereinafter TEI), including these "Nonconnah properties" at issue. The proof at trial reflected that Husband never treated any of these properties as separate property. To the contrary, the proof reflected that, regardless of the nature of their acquisition, the parties treated all of these properties as if they were jointly owned. A 2005 TEI Corporation Annual Report . . . . reflected that Wife was an officer in TEI. An email from Husband to Neal Graham dated August 12, 2013 reflected that Wife was still listed as secretary at that point.

Husband and Wife obligated themselves on notes, which were secured by deeds of trusts, for certain of the TEI properties. Husband has testified

13

more than once that Wife had full access to all of the bank accounts associated with the various TEI properties.

. . . .

Based upon all of the foregoing, this Honorable Court expressly finds that these "Nonconnah properties" are marital property. Any portion of these Nonconnah properties which may have legitimately been classified at one time as Husband's separate property have been transmuted into marital property.

(Internal citations omitted.)

On appeal, Husband alleges that the trial court erred in finding the Nonconnah Properties to be marital property. We note, however, that Husband devoted little of his brief to developing this issue and he offers only a tenuous argument in fact and law to support his position.

Husband and his two siblings each inherited a 33.33% interest in the Nonconnah Properties in 2007. At trial, Husband asserted that, in 2012, his two siblings each gifted their 33.33% interests in the Nonconnah Properties to Husband, thus giving Husband full ownership of the Nonconnah Properties. As we outlined above, a party's separate property includes "[p]roperty acquired by a spouse at any time by gift, bequest, devise or descent." Tenn. Code Ann. § 36-4-121(b)(2)(D). According to Husband, because he inherited one-third of his interest and was gifted the other two-thirds, his entire ownership interest in the Nonconnah Properties should have been classified as his separate property. As the party claiming that property acquired during the marriage is separate property, Husband had the burden of proof on this issue. *See Owens v. Owens*, 241 S.W.3d 478, 485-86 (Tenn. Ct. App. 2007).

The trial court determined that Husband did not meet that burden. With respect to the two-thirds interest Husband claimed he was gifted from his siblings, the trial court looked to the deeds transferring the property to Husband and found that the deeds themselves stated that Husband paid consideration in the amount $10.00 for each interest, thereby negating Husband's assertion that these were gifts. On appeal, Husband relies on his own testimony that he did not actually pay anything for these properties. The trial court, however, found Husband to have no credibility. Furthermore, the trial court found that since, by Husband's own admission the properties were worthless when he acquired them, "the entire current values of the properties are marital property" by virtue of Husband's use of marital funds to contribute to the preservation and appreciation of the property's interest. *See Mahaffey v. Mahaffey*, 775 S.W.2d 618, 623 (Tenn. Ct. App.

14

1989). The determination of what is marital and what is separate property pursuant to Tennessee Code Annotated section 36-4-121 is a question of fact and is subject to the standard of review in Tennessee Rule of Appellate Procedure 13(d). *Luplow v. Luplow*, 450 S.W.3d 105, 109 (Tenn. Ct. App. 2014); *Dunlap v. Dunlap,* 996 S.W.2d 803, 814 (Tenn. Ct. App. 1998) (citing *Harris v. Corley*, No. 01A01-9011-CH-00415, 1991 WL 66447, at *5 (Tenn. App. May 1, 1991)). The evidence in the record does not preponderate against the trial court's findings on the Nonconnah Properties, and we affirm the trial court's determination that the Nonconnah Properties are marital property.

## C.    Marital Silver

Husband and Wife have been litigating the distribution of their silver collection for more than four years, and they continue to do so on appeal. On September 6, 2013, Husband filed a motion to compel Wife to return personal property missing from the parties' residence. Therein, Husband alleged that Wife took several pieces of marital silver before leaving the marital residence that she never returned. Wife responded by admitting that she took various pieces of silver from the home but that she did not do so surreptitiously, as Husband suggested. The matter was heard on November 8, 2013, and on November 20, 2013, the trial court ruled that Wife must return any of Husband's separate silver that she had in her possession. Further, if Wife kept any silver she took from the marital residence, she must make a list of the same and state why she believed it was not Husband's separate property.

At trial, Husband contended that Wife had still not returned all of the silver to which he was entitled. Wife testified that she originally removed the items of silver from the marital residence in order to host a party for her nephew's birth. Wife listed all of the silver that she removed from the home in her sworn answers to Husband's discovery requests. Wife testified that, after the baby shower, she returned the items that were Husband's separate property to Husband's attorney at the time. According to Wife, the items of marital silver she retained had been purchased during the marriage or were given to the parties as wedding gifts.

In the Final Decree, the trial court found that Husband had not carried his burden of proving that Wife kept any items of silver to which she was not entitled. In that regard, the trial court found as follows:

> Husband dedicated a great deal of [time at trial] to the allegations contained in his November 8, 2013 Petition to Compel Wife to Return Items to Marital Residence. More specifically, Husband contended that Wife had removed certain marital silver, certain of Husband's alleged silver, and certain of Husband's mother's jewelry.

15

Husband has failed to meet his burden of proving that Wife removed and kept any of these items, including the alleged separate family silver. At trial, some 3 years after Mr. Trezevant's first allegation of theft on the part of Mrs. Trezevant, Mr. Trezevant presented a new, never before seen, list of purported missing silver and his value of each. Mr. Trezevant is a real estate expert. He has no expertise in personal property values. The list is not admissible as competent proof. Mrs. Trezevant returned a number of items of silver to Mr. Trezevant at the time of trial, which she had been holding at the Court's direction to protect those items for Mr. Trezevant. Husband's November 8, 2013 Petition shall be dismissed at Husband's cost. Each party shall keep the silver in their respective possession. To the extent that Wife has two candelabras, Wife shall provide one to Husband.

Husband argues on appeal that this Court should remand the matter of the silver with an instruction to the trial court to require Wife to account for the silver she has taken and not returned. However, the evidence in the record does not preponderate against the trial court's finding that Husband failed to prove that Wife retained any silver to which he was entitled. Wife testified that she returned all items of silver that were Husband's. The trial court had the opportunity to observe the demeanor of the witnesses and hear the in-court testimony regarding the marital silver, and we must afford considerable deference to the trial court's credibility determinations and the weight that the court gave to the oral testimony presented. *See Andrews v. Andrews*, 344 S.W.3d 321, 339 (Tenn. Ct. App. 2010). Whether to believe Husband or Wife on this point is within the trial court's discretion. Our review of the record does not preponderate against the trial court's finding that Husband failed to prove Wife had taken and kept any of his silver. We, therefore, affirm the court's holding regarding the parties' silver collection.

Husband also argues that it was reversible error for the trial court to reject Husband's testimony regarding the value of the silver. We agree with Husband to the extent that it was error to find Husband incompetent to testify as to the value of his own personal property. *See* Tenn. R. Evid. 701(b); *Head v. Head*, No. M1009-01351-COA-R3-CV, 2010 WL 3853291 (Tenn. Ct. App. 2010) (citing *Crook v. Mid-South Transfer & Storage, Inc.* 499 S.W. 2d 255, 260 (Tenn. Ct. App. 1973) (*citing McKinnon v. Michaud*, 260 S.W.2d 721 (Tenn. Ct. App. 1953) ("stating it is permissible for an individual to testify as to the value of his or her personal property even though he or she does not qualify as an expert")). However, we conclude that this error was harmless in light of the foregoing conclusion affirming the trial court's determination that Husband failed to prove Wife kept any silver to which he was entitled.

**D.** **Gifts to Wife**

Husband claims that the trial court erred in finding that the following transfers of funds he made to Wife were gifts and her separate property:

    A. November 1, 2007  –  $1,250,000.00

    B. February 23, 2010  –  $1,000,000.00

    C. February 23, 2010  –  $1,000,000.00

    D. September 1, 2010  –  $  200,000.00

    E. January 27, 2011  –  $  546,000.00

    F. September 27, 2011 –  $  200,000.00

    G. December 24, 2012 –  $  25,000.00

According to Wife, the explanation for the checks/gifts is as follows:

    A.    <u>November 1, 2007  –  Check to Wife for $1,250,000.00</u>

Husband received approximately $14,500,000.00 in net proceeds from the sale of five properties in October 2007. Weeks later, Husband gifted $1,250,000.00 of those proceeds to Wife on November 1, 2007. Wife testified that Husband told her that he wanted to give her $1,000,000.00 and an extra $250,000.00 so that she could buy some jewelry.

    B.    <u>February 23, 2010  –  Check to Wife for $1,000,000.00</u>

February 23 is Wife's birthday. On February 23, 2010, Husband gave Wife a check for $1,000,000.00 as a birthday gift and told her she looked like a million dollars.

    C.    <u>February 23, 2010  –  Check to Wife for $1,000,000.00</u>

Immediately after gifting Wife the aforementioned $1,000,000.00 check, on Wife's birthday in 2010, Husband gave wife a second check for $1,000,000.00 as a birthday gift. He told her that saying she looked like a million dollars was too cliché, so he gifted her a total of $2,000,000.00.

D.      September 1, 2010  –    Check to Wife for $200,000.00

September 1 is the parties' wedding anniversary.  On September 1, 2010, Husband gifted a $200,000.00 check to wife as an anniversary gift.

E.      January 27, 2011      –    Check to Wife for $546,000.00

This check from Husband to Wife for $546,000.00 was repayment by Husband for money he previously borrowed from Wife out of her separate assets.  Wife presented emails as evidence at trial in which Husband referred to this transaction as being his repayment for money Wife loaned to him.  Husband also testified before the divorce referee regarding this transaction being a loan.

F.      September 27, 2011 –    Check to Wife for $200,000.00

According to Wife, this check was a belated anniversary gift for the parties' 2011 wedding anniversary.  Wife testified that she was initially shopping for jewelry for her anniversary gift that year, but when she could not find anything she liked, Husband simply wrote her a $200,000.00 check for her to buy the jewelry whenever she found what she wanted.  When she received the money, Wife wrote in the memo line of the check "Anniv. Gift."  Wife also asserts that, since this check was given to her nearly two full years before the divorce was filed, Wife was in no way anticipating making an argument that this was her separate property at a later date when she wrote "Anniv. Gift" in the memo line of the check.

G.      December 24, 2012 –    Check to Wife for $25,000.00

Husband gave this check to Wife on Christmas Eve 2012 as a Christmas Gift.  Wife also produced an email at trial from Husband to Wife in which Husband referenced this amount being a Christmas gift.

The issues related to Wife's separate property were decided by the court before the divorce trial and final decree.  The hearing on these matters was held on December 14 and 15, 2015.[5]  According to the court, in determining whether these transfers were gifts from Husband to Wife, the court took into account the following:

[S]tatements of counsel; testimony of [Wife]; testimony of [Husband]; exhibits introduced into evidence, Memorandum of Facts and Law

[5]The court did reference this order in its Final Decree.

18

submitted by Wife, Memorandum of Facts and Law submitted by Husband, two (2) post hearing submissions dated December 16, 2016, provided by counsel for Wife, two (2) post hearing submissions dated December 22, 2015 and January 5, 2016, respectively, by counsel for Husband, additional transcripts from prior court appearances, (all of which have been marked as late filed exhibits); and upon the entire record in this cause[.]

The court further found:

The proof clearly established the three necessary elements of a gift: delivery, acceptance and Husband's intent to gift to Wife. The proof also clearly established that all of said transfers were without compensation, and all of said transfers remained in Wife's sole name and dominion and control since gifted to Wife. Husband was not provided access to said funds without Wife's express consent after each gift was made to Wife.

"'Separate property' means . . . (D) Property acquired by a spouse at any time by gift, bequest, devise or descent." Tenn. Code Ann. § 36-4-121. Gifts from one spouse to another during the marriage are not excluded from this definition. *See id*.; *Hanover v. Hanover*, 775 S.W.2d 612, 617 (Tenn. Ct. App. 1989). There is a presumption that property acquired by spouses during a marriage is marital property. *Owens v. Owens*, 241 S.W.3d. 478, 485 (Tenn. Ct. App. 2007). This presumption may be rebutted if a party shows that the property was acquired, among other things, by gift. *Dunlap v. Dunlap*, 996 S.W.2d 803, 814 (Tenn. Ct. App. 1998). The party asserting that they acquired the property by gift has the burden of proving the essential elements of a gift by clear and convincing evidence: (1) "the intention by the donor to make a present gift," and (2) "the delivery of the subject gift by which complete dominion and control of the property [was] surrendered by the donor." *See Hansel v. Hansel*, 939 S.W.2d 110, 112 (Tenn. Ct. App. 1997); *Brewer v. Brewer,* No. M2010-00768-COA-R3-CV, 2011 WL 532267 at *3 (Tenn. Ct. App. Feb. 14, 2011).

Husband asserts the principle that the testimony of a beneficiary, in this case Wife, is not sufficient to establish a gift. However, "[i]ntent is determined from the totality of the circumstances." *Id.; Harris v. Taylo*r, No. W2004-02855-COA-R3-CV, 2006 WL 772007, at *4 (Tenn. Ct. App. Mar. 28, 2006). We affirm the trial court's finding that Husband had the requisite intent to make a gift. Items acquired on birthdays, holidays or anniversaries are generally found to belong to the spouse to whom they were given. Wife explained and showed that the majority of these transfers were for exactly these types of occasions. Also, Wife introduced several emails as exhibits at trial from Husband to Wife in which he describes Wife's money as "your" money. For years after writing these checks to Wife, Husband never included these amounts on any personal financial

19

statements he made. Husband did not claim any interest in Wife's accounts in response to an interrogatory question that required him to list all items in which he had any interest. On May 1, 2014, Husband, who was representing himself at the time, apparently attempted to amend his discovery responses by hand-delivering a letter to Wife's counsel that stated in part: "Let this be clear, I claim 100% of **everything that I have given her,** since our Marriage on September 1, 1990, and everything that she has bought or received from me. Since that date is marital property, . . ." (Emphasis added.) Wife presented ample evidence for the trial court to find that, for each of the transfers, Husband delivered the check to Wife, Wife accepted the check, Husband did not put any restrictions on how Wife was to spend the money, Husband never told Wife should would have to return the money in the future, Husband told Wife she could do as she pleased with the funds, and Husband's name has never been on any account in which these monies were deposited or on any asset Wife has purchased with these funds.

Based on the totality of these circumstances, we affirm the trial court's holding that Wife proved these transfers to be her separate property by virtue of gifts from Husband. "Simply because the day of reckoning for the extravagance is at hand, we will not infer that [Husband] did not intend to make a gift . . . ." *Hanover*, 775 S.W.2d at 617.

## 2. *Dissipation of Marital Assets*

During the divorce, Husband transferred approximately $2,100,000.00 to long-time attorney and friend, Norman Klein. Mr. Klein is a lawyer in the Cayman Islands with a practice focused on general corporate and commercial law and an emphasis in real estate. According to Husband and Mr. Klein, in around 2004 the pair pursued a business venture that involved the acquisition of property that came to be known as the "Northwest Sound Property." Sloane Properties, Ltd. ("Sloane Properties") was formed to conduct the transaction. Husband asserted that he and Mr. Klein were equal partners in this deal. However, Mr. Klein did not want to be listed as an owner of this company because his law firm was the registered agent for the property and he had incorporated the entity. Mr. Klein and Husband asserted that Mr. Klein did not require any documentation of his ownership in the deal because of his long-standing relationship with Husband. According to Husband and Mr. Klein, the two split expenses related to the property evenly, and they both contributed to the venture. Therefore, when the property was sold in 2012, the two split the profit equally, with Mr. Klein's portion being $2,145,065.55.

The trial court held a hearing on August 3, 2015. At that hearing, the court and counsel for Husband engaged in the following exchange:

20

THE COURT:  I've already told Mr. Fishman and Mr. Trezevant short of a written agreement or something with this man, here, testifying, such that he is credible to me, all of that profit is going in Mr. Trezevant's column.

MR. CAYWOOD:  I've got an email from Mr. Norman [Klein] saying there are no documents, an e-mail from him.

THE COURT:  I understand that.  We've already been over that extensively, and I said to you, and to Mr. Fishman and Mr. Trezevant, short of written documents not produced subsequent to this announcement, every bit of that – or Mr. [Klein] sitting on this witness stand and convincing me, credibly, that this man would give away half of several million dollars, that is going in Mr. Trezevant's column.  I've already said that.  Mr. Fishman heard me.

At the same hearing, the court also opined:

You don't do business like that over two million dollars and a handshake.  I just don't buy it.  I'm sorry.

That's not an absolute judgment.  I'm just telling you that there's a question in this Court's mind about a lawyer who has represented this man, or been a friend, with this man, getting two million dollars and a handshake.

The first thing one assumes is that it's been put aside to be given back,  or portions of it given back, after this man gets his pay for doing it, to Mr. Trezevant after the divorce.  That's a very logical conclusion, Mr. Fishman.  So you have to overcome that.

Tennessee Code Annotated section 36-4-121(c)(5)(B) provides that "dissipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed."

A party's dissipation of marital or separate property is one of many factors a trial court may take into consideration in making an equitable division of a marital estate. Tenn. Code Ann. § 36-4-121(c)(5).  While there is no statutory definition of dissipation, the term typically refers to the use of marital property for a purpose unrelated to the marriage, often to "hide, deplete, or divert" marital property after a marriage is irretrievably broken.  *Larsen-Ball v. Ball*, 301 S.W.3d 228, 235 (Tenn. Ct. App. 2010). "The concept of dissipation is based on waste."  *Altman v. Altman*, 181 S.W.3d 676, 681

21

(Tenn. Ct. App. 2005).

In determining whether dissipation has occurred, the court "must distinguish between dissipation and discretionary spending." *Larsen-Ball*, 301 S.W.3d at 235. While discretionary spending may be ill-advised, "it is typical of the parties' expenditures throughout the course of the marriage." *Id.* Expenditures that constitute dissipation, on the other hand, are so far removed from normal expenditures that they can be characterized as wasteful or self-serving. *See Watson v. Watson*, 309 S.W.3d 483, 490 (Tenn. Ct. App. 2009). In *Watson*, this Court discussed the appropriate analysis for allegations of dissipation:

> In determining whether dissipation occurred, we find trial courts should consider the following: (1) whether the evidence presented at trial supports the alleged purpose of the various expenditures, and if so, (2) whether the alleged purpose equates to dissipation under the circumstances. The first prong is an objective test. To satisfy this test, the dissipating spouse can bring forward evidence, such as receipts, vouchers, claims, or other similar evidence that independently support the purpose as alleged. The second prong requires the court to make an equitable determination based upon a number of factors. Those factors include: (1) the typicality of the expenditure to this marriage; (2) the benefactor of the expenditure, namely, whether it primarily benefitted the marriage or primarily benefitted the sole dissipating spouse; (3) the proximity of the expenditure to the breakdown of the marital relationship; (4) the amount of the expenditure.

*Id.* at 490-91 (quoting *Ward v. Ward*, No. W2001-01078-COA-R3-CV, 2002 WL 31845229, at *3 (Tenn. Ct. App. Dec. 19, 2012)). The party alleging dissipation has "the initial burden of production and the burden of persuasion at trial." *Larsen-Ball*, 301 S.W.3d at 235. Once the party alleging dissipation establishes that the money has been dissipated, "the burden shifts to the party who spent the money to produce evidence to show that the expenditures were appropriate." *Watson*, 309 S.W.3d at 491 (quoting *Wiltse v. Wiltse*, No. W2002-03132-COA-R3-CV, 2004 WL 1908803, at *4-5 (Tenn. Ct. App. Aug. 24, 2004)). The trial court's determination of whether a party dissipated marital assets is a finding of fact. *See Altman v. Altman*, 181 S.W.3d 676, 682 (Tenn. Ct. App. 2005). Dissipation is generally "intentional and purposeful conduct that has the effect of reducing the funds available for distribution." *Id.* (citation omitted). A court may look at whether the spouse "intended to hide, deplete, or divert a marital asset." *Id.* (quoting *Long v. Long*, No. M2006-02526-COA-R3-CV, 2008 WL 2649645 at *9 (Tenn. Ct. App. July 3, 2008)).

Husband argues that the trial court improperly put the burden on him to show that there was no dissipation, rather than on Wife to show that there was. However, the record shows sufficient evidence for a prima facie case of dissipation by showing that Husband transferred more than $2 million during the course of the divorce to an associate in the Cayman Islands without any evidence that Mr. Klein was entitled to that sum of money. The spouse alleging dissipation has the burden of persuasion and the initial burden of production to show that the other spouse engaged in "intentional, purposeful, and wasteful conduct." *Berg v. Berg*, No. M2013-00211-COA-R3-CV, 2014 WL 2931954 at *18 (Tenn. Ct. App. June 25, 2014). Once the party alleging dissipation has established a prima facie case of dissipation, the burden shifts to the other spouse to show the court that the expenditures were not dissipation. *Id.* Husband argues that Mr. Klein's deposition was sufficient affirmative evidence to show that he was an equal partner in the North Sound Property.

We disagree. The trial court found that Husband wanted to the court to believe that Mr. Klein gave Husband funds to purchase real estate that was owned exclusively by Husband. Mr. Klein admitted that the North Sound Property was owned entirely by Husband's company, Sloane Properties, and that there were no documents that substantiated the claim that he owned any portion of Sloane Properties or the North Sound Properties. This is despite Mr. Klein's expertise in the area of real estate. Mr. Klein said that he trusted Husband would hold fifty percent of the shares of the Sloane Properties for him by virtue of a "handshake deal." Mr. Klein also testified he would not recommend to his clients that they purchase real estate without a contract and that they should enter into a binding agreement. The Cayman Islands has a rule of law similar to the American "statute of frauds," which requires contracts for the sale or purchase of real property to be in writing. Moreover, Husband and Mr. Klein had differing stories about whose idea this business venture was. When Sloane Properties borrowed $1,500,000.00 for a transaction related to the North Sound Properties, Mr. Klein was not a debtor on the promissory note. Wife also gave the trial court various examples of how Mr. Klein's "contributions" to the venture were not what they seemed and that they did not actually tie Mr. Klein to the deal. While Husband claims Mr. Klein was responsible for some of the venture's expenses, Husband was unable to identify what Mr. Klein's expenses were when asked about them at trial.

Based on the foregoing, we conclude that the evidence does not preponderate against the trial court's determination that Husband dissipated the more than $2 million dollars that he transferred to Norman Klein during the divorce proceedings.

### 3. *Valuation of Marital Estate*

Next, Husband asserts that the trial court's valuation of the marital property

23

awarded to him was $24 million too high.  After identifying the marital property, the trial court was vested with the task of valuing that property.  Of great consequence in this appeal is that there is a multi-million dollar disparity in the value assigned to the marital estate by Husband versus the value assigned by Wife.  At trial, Wife proffered a financial statement prepared by Husband on July 16, 2012, which was more than four years before the trial of this matter (the "Financial Statement").  Husband offered more than twenty certified appraisals for several of the parties' most valuable commercial and residential properties.  Ultimately, the trial court heavily relied on Husband's July 2012 Financial Statement and found the marital estate to be worth at least $44,339,611.00.  The court awarded Husband $34,204,026.00 and Wife $10,135,585.00 (plus alimony in solido and in futuro in an attempt to equalize the distribution of marital assets).   Husband says that the 2012 Financial Statement (that he prepared) is unreliable and he used inflated figures that are much higher than the actual value for the properties.  This Financial Statement was unsigned, unsworn, and unaudited, and was over 4 ½ years old at the time of the trial court's ruling.  Husband testified that he substantially exaggerated the values that he put on his properties on the 2012 Financial Statement. Husband argues that the trial court used the inflated values for the property given to Husband but the more reasonable values for the property given to Wife.  Husband asserts that his equity was overvalued by more than $24,000,000.00.  Husband believes that the trial court did this to punish him, which is not proper in the valuation and distribution of marital property.

At trial, two certified appraisers testified as to the value of some of the most valuable commercial properties.   One of these appraisers was Todd Glidewell, a commercial appraiser for Valbridge Property Advisers.   The effective dates for the appraisals were 2015 and 2016.  Appraisals by Mr. Glidewell compared to the trial court's ultimate valuation are:

|  | Glidewell's Appraisal | Trial Court's Value |
| --- | --- | --- |
| Shops of Milan | $1,760,000.00[6] | $3,500.000.00[7] |
| Oaks in Oakland | $4,090,000.00[8] | $5,600,000.00[9] |

[6]The effective date of this valuation was January 21, 2015.

[7]This valuation is based on Husband's 2012 Financial Statement as well as an additional unsworn financial statement by Husband dated January 2015.

[8]The effective date of this valuation was February 18, 2015.

[9]This valuation is based on Husband's 2012 Financial Statement.

| | | |
|---|---|---|
| Sloane's Square | $2,650,000.00[10] | $6,262,000.00[11] |
| Market/Poplar Est. | $30,000.00[12] | $500,000.00[13] |
| 7092 Poplar House | $160,000.00[14] | $650,000.00[15] |
| Abbington Center | $1,200,000.00[16] | $1,900,000.00[17] |
| 670 Riverside | $430,000.00[18] | $430,000.00[19] |
| 7038 Poplar | $490,000.00[20] | $490,000.00[21] |

The difference in the values that were submitted by Mr. Glidewell versus the value adopted by the trial court was $8,522,000.00.

---

[10] The effective date of this valuation was February 18, 2015.

[11] This valuation is based on Husband's 2012 Financial Statement.

[12] The effective date of this valuation was February 25, 2015.

[13] This valuation is based on Husband's 2012 Financial Statement.

[14] The effective date of this valuation was February 18, 2015.

[15] This valuation is based on Husband's 2012 Financial Statement.

[16] The effective date of this valuation was August 16, 2016.

[17] This valuation is based on Husband's 2012 Financial Statement.

[18] The effective date of this valuation was February 24, 2015.

[19] This valuation was based on Husband's June 28, 2015 financial statement. Husband complains that this property was not subject to the inflated values of the 2012 Financial Statement and it was awarded to Wife in the final property division.

[20] The effective date of this valuation was February 11, 2014.

[21] This valuation was based on Husband's June 28, 2015 financial statement. Husband complains that this property was not subject to the inflated values of the 2012 Financial Statement and it was awarded to Wife in the final property division.

Rip Walker is another certified appraiser who appraised several commercial properties for the parties and testified at trial. Mr. Walker disagreed with the values that Husband placed on several properties in his 2012 Financial Statement.

| | Walker's Appraisal | Trial Court's Value |
|---|---|---|
| Olivia's Square | $2,845,000.00[22] | $5,400,000.00[23] |
| Shops at Southaven | $735,000.00[24] | $2,700,000.00[25] |
| 615 West Poplar | $820,000.00[26] | $1,700,000.00[27] |
| Hamilton Storage | $950,000.00[28] | $1,200,000.00[29] |
| McCracken Road | $1,400,000.00[30] | $2,000,000.00[31] |
| 3400 Pleasant Hill Road | $320,000.00[32] | $735,000.00[33] |

[22]The effective date of this valuation was May 9, 2015.

[23]This valuation is based on Husband's 2012 Financial Statement.

[24]The effective date of this valuation was June 21, 2015.

[25]This valuation is based on Husband's 2012 Financial Statement.

[26]The effective date of this valuation was May 4, 2015.

[27]This valuation is based on Husband's 2012 Financial Statement. This property was given to Wife in the distribution of the marital estate.

[28]The effective date of this valuation was January 28, 2015.

[29]This valuation is based on Husband's 2012 Financial Statement. It was also based on an unsworn financial statement from Husband from December 31, 2013.

[30]The effective date of this valuation was January 28, 2015.

[31]This valuation is based on Husband's 2012 Financial Statement as well as an additional unsworn financial statement by Husband dated January 2015.

[32]The effective date of this valuation was January 28, 2015.

| | | |
|---|---|---|
| 0 Poplar View | $865,000.00[34] | $2,100,000.00[35] |
| Hamilton Storage | $4,380,000.00[36] | $4,700,000.00[37] |
| 870 Rasco | $785,000.00[38] | |
| 891 Rasco | $145,000.00[39] | $1,200,000.00[40] |
| 939 Rasco | $200,000.00[41] | |
| Highway 72 | $300,000.00[42] | $300,000.00[43] |

The difference in the values that were submitted by Mr. Walker versus the value adopted by the trial court was $8,290,000.00.

---

[33]This valuation is based on Husband's 2012 Financial Statement as well as an additional unsworn financial statement by Husband dated January 2015.

[34]The effective date of this valuation was February 2, 2015.

[35]This valuation is based on Husband's 2012 Financial Statement as well as an additional unsworn financial statement by Husband dated January 2015.

[36]The effective date of this valuation was January 28, 2015.

[37]This valuation is based on Husband's 2012 Financial Statement as well as an additional unsworn financial statement by Husband dated December 2013.

[38]The effective date of this valuation was January 28, 2015.

[39]The effective date of this valuation was August 18, 2016.

[40]This valuation is based on Husband's 2012 Financial Statement, which is a total of 870, 891, and 939 Rasco, as well as an additional unsworn financial statement by Husband dated December 2013.

[41]The effective date of this valuation was August 18, 2016.

[42]The effective date of this valuation was October 13, 2015.

[43]This valuation was based on the October 19, 2015 appraisal. Husband complains that this property was not subject to the inflated values of the 2012 Financial Statement and it was awarded to Wife in the final property division.

Husband argues that the trial court erred as a matter of law in rejecting the certified appraisals. The valuation of marital property is a question of fact for the trial court and is presumed correct unless the evidence preponderates otherwise. *Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987). "The burden is on the parties to produce competent evidence of value, and the parties are bound by the evidence they present." *Id.* Regarding the use of the Financial Statement, the trial court stated as follows:

> The July 16, 2012 financial statement was the last financial statement submitted by Husband to a bank prior to the filing of the instant divorce action. Moreover, even after Husband received the divorce appraisals, Husband continued to disregard same with respect to the values he presented to the bank on his final financial statement. As such, the Court utilized the July 16, 2012 financial statement.

The trial court rejected the more recent certified appraisals in favor of the Financial Statement with very little explanation. "In bench trials, trial courts must make findings of fact and conclusions of law to support their rulings." *Hardin v. Hardin*, No. W2012-00273-COA-R3-CV, 2012 WL 6727533, at *3 (Tenn. Ct. App. Dec. 27, 2012). Tennessee Rule of Civil Procedure 52.01 states, in pertinent part:

> In all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment.

"Simply stating the trial court's decision, without more, does not fulfill this mandate." *Barnes v. Barnes*, No. M2011-01824-COA-R3-CV, 2012 WL 5266382, at *8 (Tenn. Ct. App. Oct. 24, 2012). "[T]he General Assembly's decision to require findings of fact and conclusions of law is 'not a mere technicality.'" *Hardin*, 2012 WL 6727533, at *3 (quoting *In re K.H.*, No. W2008-01144-COA-R3-PT, 2009 WL 1362314, at *8 (Tenn. Ct. App. May 15, 2009)). Such findings and conclusions "facilitate appellate review by affording a reviewing court a clear understanding of the basis of a trial court's decision." *Lovlace v. Copley*, 418 S.W.3d 1, 34 (Tenn. 2013). In the absence of sufficient findings and conclusions, "'this court is left to wonder on what basis the court reached its ultimate decision.'" *In re K.H.*, 2009 WL 1362314, at *8 (quoting *In re M.E.W.*, No. M2003-01739-COA-R3-PT, 2004 WL 865840, at *19 (Tenn. Ct. App. Apr. 21, 2004)).

> There is no bright-line test by which to assess the sufficiency of factual findings, but "the findings of fact must include as much of the subsidiary facts as is necessary to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue."

*Lovlace*, 418 S.W.3d at 35 (quoting 9C *Federal Practice & Procedure* § 2579, at 328).

Unfortunately, in this case, we cannot determine whether the trial court applied an incorrect legal standard or relied on reasoning that caused an injustice because we do not know what legal standard the court applied or what reasoning it employed. *See Halliday v. Halliday*, No. M2011-01892-COA-R3-CV, 2012 WL 7170479, at *12 (Tenn. Ct. App. Dec. 6, 2012), *perm. app. denied* (Tenn. Apr. 11, 2013) (explaining that "this Court cannot determine whether the trial court abused its discretion" in the absence of factual findings by the trial court). This Court is "left to wonder" about the basis of the trial court's decision, *In re K.H.*, 2009 WL 1362314, at *8, and consequently, "we are unable to conduct meaningful appellate review." *In re Estate of Bostic*, No. E2016-00553-COA-R3-CV, 2016 WL 7105213, at *5 (Tenn. Ct. App. Dec. 6, 2016) (*no perm. app. filed*).

Discretionary decisions of a trial court must take applicable facts and legal principles into account and are not immune from meaningful review on appeal. *See Gooding v. Gooding*, 477 S.W.3d 774 (Tenn. Ct. App. 2015). Considering the trial court's assessment and emphasis on Husband's lack of credibility, it does not seem reasonable to assign credibility to his financial statements without a more in depth explanation for ignoring independent appraisals of the properties. Husband even testified that he "grossly exaggerated" the values he put on his 2012 Financial Statement. Without a clear explanation from the trial court regarding exactly what it found to be unreliable within the appraisals themselves, it is impossible for us to know whether the court below employed the correct legal standard. We find this to be particularly true in this case where the court appears to have violated the statutory directive found in Tennessee Code Annotated section 36-4-121(b)(1)(A), which instructs the court to value the marital property as near as possible to the date it is divided. *See also Owens v. Owens*, 241 S.W.3d 478, 486 (Tenn. Ct. App. 2007). Wife did not object to the appraisals or to the testimony of Mr. Glidewell or Mr. Walker at trial. She also did not submit competing appraisals. As discussed in more detail in the section on criminal contempt below, there were several instances prior to trial in which Wife accused Husband of not having certain properties appraised, and they were then appraised. However, this does not mean that once they were appraised that the appraisals were wrong. We are simply unwilling to extrapolate from the Final Decree that because Husband and his agent were involved in the appraisal process, there was sufficient evidence to throw out the certified appraisals and instead rely on a 2012 Financial Statement prepared by Husband. The allegation that Husband manipulated the appraisals is simply not to be found anywhere in the Final Decree.

According to Wife, the appraisals relied heavily on information prepared and provided by Husband. Husband has been found to be untrustworthy and attempted to manipulate the divorce appraisals. However, as Husband points out, the trial court made

29

no finding in its Final Decree that Husband manipulated the twenty plus certified appraisals that the court disregarded in valuing the properties. Wife cites to oral statements made by the court that purportedly further explain the reason the court used Husband's 2012 Financial Statement rather than the Appraisals. In effect, the court discussed its continued belief that Husband was not a credible witness and that the Financial Statement was the last valuation of assets before the divorce began. However, there are no findings to that effect in the written order. A trial court "speaks through its order, not through the transcript." *In re Adoption of E.N.R.*, 42 S.W.3d 26, 31 (Tenn. 2001). Both parties make much of the trial court's oral comments in a hearing on May 17, 2017, months after the Final Decree was entered in this matter. We agree with Husband that the court's commentary months after entry of the Final Decree cannot serve to bolster an incomplete explanation of the court's analysis in the Final Decree itself.

Appellate courts have two options when a trial court's factual findings fail to satisfy the Rule 52.01 requirement. One is to conduct an independent analysis of the record and "determine where the preponderance of the evidence lies." *Lovlace*, 418 S.W.3d at 36; *See Town of Middleton v. City of Bolivar*, No. W2011-01592-COA-R3-CV, 2012 WL 2865960, at *26 (Tenn. Ct. App. July 13, 2012) (noting that "when faced with a trial court's failure to make specific findings, the appellate courts may 'soldier on' when the case involves a clear legal issue, or when the court's decision is readily ascertainable.") (citations omitted). The alternative is to vacate the decision and remand the case to the trial court with instructions to issue sufficient findings of fact and conclusions of law. Husband asserts that, in addition to the staleness of his 2012 Financial Statement used by the courts, it was not specific enough to be considered competent evidence. Unlike the certified appraisals, the Financial Statement did not analyze specific factors such as current vacancy rates, interest rates, or comparable properties. In light of the fact-intensive nature of the valuation of the marital property, we deem it necessary to vacate and remand this matter for further analysis by the trial court. We therefore vacate the trial court's valuation of the parties' marital property.

As a result, we must necessarily also vacate the distribution of marital property. We are not opining that, on remand, the trial court is required to blindly accept the appraisals that have already been performed in this case. In fact, many of these appraisals are now more than two years old, and by statute courts must rely on values of the marital property as close in time as possible to the division of marital property. While we recognize the existence of appraisals in the record, we leave it to the discretion of the trial court to determine whether updated appraisals are necessary or appropriate. We remand this issue for the trial court to articulate detailed findings of fact and conclusions of law regarding the analysis it employs to value and distribute the marital estate.

### 4.    *Award of Spousal Support*

We now turn to Husband's assertion that the trial court erred in awarding alimony in solido and alimony in futuro to Wife. The trial court ordered Husband to pay Wife $7,500,000.00 as alimony in solido over the course of five years, with that amount accumulating interest at a rate of five percent per annum. The court also awarded Wife alimony in futuro in the amount of $25,000.00 per month for the first 72 months of the award and $20,000.00 per month for every month thereafter. However, any issues on appeal related to alimony are pretermitted by our holding that the valuation of the marital estate should be vacated. "In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including: . . . . (8) The provisions made with regard to the marital property, as defined in § 36-4-121." Tenn. Code Ann. § 36-5-121(i)(8). Because the trial court may award spousal support only after the court has equitably divided the parties' marital property, the awards of alimony are vacated and remanded for reconsideration in light of a proper valuation and distribution of the marital estate.

### 5. *Wife's Attorney's Fees at Trial*

Husband asserts that this Court must also reverse the trial court's award of $464,890.92 in attorney's fees to Wife as a consequence of vacating the valuation and division of the marital estate. In support of this award, the trial court lamented:

> Plainly and simply, Husband has caused Wife to spend outrageous amounts of time and money to discover, identify and classify the parties' marital estate.
>
> . . . .
>
> Husband has been deceitful and dishonest, and his trial tactics have exacerbated the fees tremendously. . . .
>
> Based upon the foregoing, Husband shall be responsible for one half of <u>all</u> of the attorney fees and suit expenses that Wife has incurred from the very onset of this divorce.

(Emphasis in original.) Although our review of the record in this case supports the sentiment of the trial court expressed above, we nevertheless vacate the court's award of attorney's fees to Wife. In the context of a divorce, an award of attorney's fees to an economically disadvantaged spouse is generally considered an award of alimony in

31

solido. *See Gonsewski v. Gonsewski*, 350 S.W.3d 99 (Tenn. 2011). The trial court also implicitly acknowledged its award of attorney's fees to Wife as alimony in solido. Therefore, the court's award of attorney's fees to Wife is also vacated by virtue of the need to re-evaluate the marital estate. We vacate the award and remand for reconsideration.

### *6. Criminal Contempt*

In its Final Decree, the trial court found Husband guilty of 19 counts of criminal contempt for hiding assets, unlawfully transferring assets, and lying to the court, among other things. He was sentenced to 55 days in jail. His sentence is stayed pending appeal. On appeal, Husband asserts that his convictions should also be overturned on the merits. He also alleges that the trial court erred by not properly considering whether his sentences should run concurrently or consecutively. Wife, on the other hand, contends that Husband attempted on many occasions to hinder and obstruct justice. According to Wife and the trial court, Husband did not want Wife or the trial court to know the full extent of the marital estate. The court found that it not only caught Husband hiding assets but, on occasion, also orchestrating the cover-up.

The steps required to punish an individual for criminal contempt are: (1) a finding of guilt beyond a reasonable doubt; (2) a determination of the punishment for the contempt; and (3) a determination of the manner in which the individual will serve their sentence. *In re: Sneed*, 302 S.W.3d 825 (Tenn. 2010). When determining guilt in the trial court, pursuant to Tennessee Code Annotated section 29-9-102(3), Husband was presumed innocent until proven guilty beyond a reasonable doubt. However, on appeal, Husband loses his presumption of innocence, and we review the trial court's finding of criminal contempt for whether there was any reasonable basis upon which the trial court could have come to a determination of guilt beyond a reasonable doubt. *See also, Black v. Blount*, 938 S.W.2d 394, 399 (Tenn. 1996); Tenn. R. App. P. 13(e). Tennessee Code Annotated section 29-9-102 sets forth the scope of a court's power to hold a person in civil or criminal contempt:

> The power of the several courts to issue attachments, and inflict punishments for contempts of court, shall not be construed to extend to any except the following cases:
>
> **(1)  The willful misbehavior of any person in the presence of the court, or so near thereto as to obstruct the administration of justice;**
>
> (2)  The willful misbehavior of any of the officers of such courts, in their official transactions;

**(3)     The willful disobedience of any** officers of the such courts, party, juror, witness, or any other **person, to any lawful** writ, process, **order**, rule, decree, or command of such courts;

**(4)     Abuse of, or unlawful interference with, the process or proceedings of the court;**

(5)     Willfully conversing with jurors in relation to the merits of the cause of the trial of which they are engaged, or otherwise tampering with them; or

(6)     Any other act or omission declared a contempt by law.

(Emphasis added.)

PROOF OF CRIMINAL CONTEMPT

The following is an analysis of the trial court's findings on the merits of the 19 counts of criminal contempt against Husband.

A.     939 Rasco and 891 Rasco (Counts 1, 2, and 3)

The trial court's first three findings of contempt against Husband relate to his purchase of real estate in violation of the mandatory injunctions imposed by Tennessee Code Annotated section 36-4-106(d)[44] and what the court found to be Husband's deliberate attempts to conceal assets from Wife and the court. The trial court detailed its findings on these matters as follows:

Husband was served with Wife's Complaint for Absolute Divorce on August 16, 2013. In violation of the statutory injunctions that went into effect when Husband was served, Husband paid $198,277.59 on August 27, 2016 to purchase 939 Rasco Road.

In Interrogatory Number 9, Husband was asked to identify all real property in which he had an interest. Husband identified 870 Rasco Road, however,

---

[44]The temporary mandatory injunctions imposed by Tennessee Code Annotated section 36-4-106(d) go into effect against both parties at the time of the filing and service of a petition for divorce. Among the injunctions listed in this section is "[a]n injunction restraining and enjoining both parties from transferring, assigning, borrowing against, concealing or in any way dissipating or disposing, without the consent of the other party or an order of the court, of any marital property." Tenn. Code Ann. 36-4-106(d)(1)(A).

33

Husband did not identify 939 or 891 Rasco Road. Husband claimed that the parcel numbers for these properties were buried in the exhibits to his Interrogatory Answers, however, there is no dispute that neither 939 nor 891 Rasco were identified by address.

Husband attempted to defend himself at trial by claiming that 939 and 891 Rasco were discussed in Husband's deposition. A closer look at Husband's deposition reveals that (a) 939 and 891 Rasco were only discussed in Husband's deposition after counsel for Wife confronted Husband about their omission, and (b) Husband wanted Wife and Wife's counsel to believe that "Hamilton Center Rasco Road" included all of his Rasco properties. That is important when it comes to Husband's September 2015 disclosure.

. . . .

On September 22, 2015, this Court entered an Order. Paragraph One of that Order provided as follows:

> The Court orders the parties to file, under oath, by September 25, 2015, a physical description of each property, the value placed by each party on the property or entity, if the property has been appraised, the name of the appraiser, when the appraisal was made and the appraisal value disclosed.

. . . .

Trial Exhibit 45 reflects that, in response to this Court's September 22, 2015 Order, Husband simply disclosed "Hamilton Storage – Rasco Road." Husband also indicated in his disclosure that "Hamilton Storage – Rasco Road" had been appraised for $785,000. Husband contended at the divorce trial that the entry of "Hamilton Storage – Rasco Road" at the value of $785,000 included all of his Rasco Road properties. As evidenced by his April 2015 deposition testimony, the Court has no question that this is precisely what Husband hoped Wife would believe. Yet, there is also no question that this is simply not true.

When Husband tendered Trial Exhibit 45, he had only appraised 870 Rasco Road. . . . 870 Rasco Road was appraised for $785,000. Contrary to Husband's sworn testimony of October 14, 2016, the $785,000 appraisal of 870 Rasco Road did not include 939 Rasco Road, nor did it include 891 Rasco Road. The $785,000 value was strictly for 870 Rasco Road.

34

Husband failed completely to identify both 939 Rasco Road and 891 Rasco Road in his September 2015 Court Ordered disclosure. Rather, he hoped that Wife and the Court would buy his April 2015 deposition testimony that 939 and 891 Rasco were included in the appraised value of 870 Rasco. Once again, the facts belie Mr. Trezevant's testimony.

After Wife filed her October 14, 2014 Petition for Contempt, Husband finally had 939 Rasco and 891 Rasco appraised. . . . 939 Rasco was appraised for $200,000. 891 Rasco was appraised for $145,000.

At trial, Husband had the audacity to blame Wife and Wife's counsel for his own failure to omit 939 Rasco and 891 Rasco . . . . This Honorable Court expressly finds that Husband's purchase of 939 Rasco on August 27, 2013 was in willful violation of the statutory injunctions. This constitutes one count of criminal contempt.

This Honorable Court further finds that Husband's failure to disclose (and purposeful attempt to conceal) his interest in and to 939 and 891 Rasco Road, were in willful violation of the September 22, 2015 Order. This constitutes two additional counts of criminal contempt.

(Internal citations omitted.)

Husband makes virtually no argument on appeal regarding the merits of Count 1 of contempt, in which the court found that he violated the mandatory injunction contained in Tennessee Code Annotated section 36-4-106(d) by purchasing real estate after being served with the divorce complaint and notice of injunctions. Regarding Counts 2 and 3, which relate to Husband's disclosure of his interest in 939 and 891 Rasco, Husband asserts that these convictions "reveal no willfulness on Husband's part." He goes on to argue that the full identities of these properties were eventually disclosed in the course of trial, apparently implying that where there is no harm there is no foul.

The trial court, however, made the specific findings of fact set forth above that support the allegation that Husband's failure to disclose the full value of the "Hamilton Center – Rasco Road" properties constituted deliberate attempts on more than one occasion to conceal this information from Wife and the court. Our review of the record does not preponderate against these findings. We also reject Husband's suggestion that his contemptuous behavior is negated in some way by the fact that Wife eventually discovered the true nature of the Rasco Road properties and brought it to the court's attention. We affirm Husband's convictions on Counts 1, 2, and 3.

B.       57 W. Virginia (Count 4)

The trial court held Husband in criminal contempt on Count 4 based on his failure to disclose one of the two parcels that comprise the property known as "57 W. Virginia." The court found as follows with regard to Count 4:

> Wife alleged in her October 14, 2015 Petition for Contempt that Husband had only appraised one of the two parcels which make up 57 W. Virginia. Lot 1, which ends in Parcel #0008 was revealed and appraised. Lot 2, which ends in Parcel #0010 had not been revealed or appraised. Only after Wife filed her Petition for Contempt did Husband have the Parcel ending in #0010 appraised. That appraisal was effective August 30, 2016, and the report was dated September 7, 2016.

> Husband's failure to identify the full property constitutes another willful violation of the September 22, 2015 Order. This brings Husband's overall total thus far to four counts.

(Internal citations omitted.)

On appeal, Husband makes the same arguments relative to Count 4 that he made with respect to Counts 2 and 3. In particular, Husband asserts that there is not proof beyond a reasonable doubt that his failure to disclose parcel #0010 was willful. However, the standard on which we review the trial court's determination of criminal contempt is not whether we would find Husband guilty of this count beyond a reasonable doubt. Rather, it is whether there is any basis upon which the trier of fact could have done so. Based upon our review of the record, including the multiple other instances in which the trial court found that Husband was attempting to conceal assets, we determine that there is sufficient evidence upon which a trier of fact could have found Husband's failure to have the full value of 57 W. Virginia appraised was willful. We therefore affirm the trial court's finding of contempt against Husband on Count 4.

C.       75 W. Virginia (Count 5)

The trial court found Husband guilty of Count 5 of criminal contempt because he did not disclose his ownership interest in the property known as "75 W. Virginia." On appeal, as he did at trial, Husband contends that he did not willfully fail to disclose this property. Rather, according to Husband, his sister and his business partner were the actual owners of 75 W. Virginia, and Husband did not invest any marital money into the property. The trial court found this explanation by Husband to be "outrageously false" and "intended solely to deceive this Honorable Court." In holding Husband guilty of

criminal contempt for failing to disclose his interest in 75 W. Virginia, the trial court found the following:

> At trial, counsel for Wife asked Husband about when he acquired 75 W. Virginia. Husband had the unmitigated gall to respond by stating that counsel for Wife was "misleading the Courts" because he did not acquire 75 W. Virginia.
>
> Husband attempted to suggest that he did not learn that he had an interest in 75 W. Virginia until his sister came to testify at the divorce trial. This is so patently false, it is offensive to the Court. First . . . Husband's sister never mentioned 75 W. Virginia by name. In fact, she testified that she had no idea what became of the $15,000 that she allegedly gave to Husband to invest (but also allegedly paid herself back out of their mother's estate). Moreover, Husband had already sworn in his August 30, 2016 discovery supplement that he had acquired an interest in 75 W. Virginia. Trial Exhibit 51 reflects that the Quitclaim Deed for the acquisition of 75 W. Virginia was sent directly to Husband's property at 7092 Poplar Avenue.
>
> This Honorable Court adopts and incorporates its entire discussion regarding 75 W. Virginia from the "Separate Property" Section hereinabove as if copied herein verbatim.[45] There is absolutely no question that Husband failed to disclose this property in response to the September 22, 2015 Order. This constitutes another count of criminal contempt. This brings Husband's overall total thus far to five counts.

(Internal citations omitted.)

Again, Husband makes a conclusory assertion on appeal that this count of contempt against him should be reversed because there is no proof that his failure to disclose 75 W. Virginia was "willful." On the other hand, the trial court explained its findings regarding 75 W. Virginia in substantial detail and concluded that "Husband's testimony regarding 75 W. Virginia was emblematic of Husband's overall disregard for his sworn oath." The record does not preponderate against the trial court's findings on this count, and there is ample evidence by which a trier of fact could find Husband guilty of contempt for his nondisclosure of 75 W. Virginia. We affirm Count 5 of criminal contempt against Husband.

---

[45]In the "Separate Property" portion of the Final Decree, the trial court articulated its reasons for rejecting Husband's contention any interest he owned in 75 W. Virginia was his separate property, including the conflicting testimony of Husband and Husband's sister regarding the acquisition of the property.

D.    Abbington Center (Count 6)

Count 6 of criminal contempt against Husband relates to another instance in which the trial court determined that Husband violated the statutory injunctions found in Tennessee Code Annotated section 36-4-106(d) by purchasing, buying, or selling real estate after being served with the divorce complaint and notice of injunctions:

> Abbington Center conveyed property to the State of Tennessee in exchange for $30,000.  Husband did not seek Court approval prior to doing so, nor timely inform the Court or Ms. Trezevant of same, which is yet another violation of the statutory injunction.  This brings Husband's overall total thus far to six counts.

(Internal citations omitted.)

Husband does not appear to make any substantive argument that this count should be reversed on the merits other than his general argument that his criminal contempt convictions should be reversed for lack of proof.   Our review of the record supports the trial court's conclusion that Husband violated the injunction in Tennessee Code Annotated section 36-4-106(d) with respect to the Abbington Center transaction.[46]  We affirm Count 6 of criminal contempt against Husband.

E.    Shops of Southaven (Counts 7 and 8)

The trial court found Husband guilty of criminal contempt in Count 7 and Count 8 for his involvement in the sale of property known as "Lot 2" of the "Shops of Southaven."  The trial court explained its findings related thereto as follows:

> Husband has a one-third ownership interest in Goodman Malone. Goodman Malone owns the real estate known as The Shops of Southaven. Husband had the Shops of Southaven appraised in June of 2015.  That appraisal reflects that 7.773 acres were appraised at $3,150,000, and that Husband's one-third was appraised for $735,000.  Husband admitted that this June 2015 appraisal included only Lot 1.  The appraisal did not include Lot 2, which constituted 0.08 acres, and Lot 4, which included 2.1 acres.
>
> Despite that the Shops of Southaven appraisal was incomplete, Husband used the $735,000 value in his disclosure pursuant to the September 22,

---

[46]Although it is not directly addressed by the parties on appeal or by the trial court in its Final Decree, "Abbington Center" appears in the record to be a business enterprise under Husband's ownership and control.

2015 Order.  Wife thus raised these issues in her October 14, 2015 Petition for Contempt.  Only after Wife filed the Petition did Husband have the remainder of the Shops of Southaven appraised, on November 20, 2015.

However, by the time that the Shops of Southaven were re-appraised in November of 2015, Lot 2 had already been sold by Goodman Malone.  Lot 2 was sold on July of 2015.  Husband attempted to suggest that because he was only a one-third owner, the other two partners sold the property without his blessing.  This is precisely what Husband wanted Wife and this Court to believe.  However, Trial Exhibit 259 told the actual story.

Trial Exhibit 259 was a May 19, 2015 email from Husband to attorney, Neal Graham at Harris Shelton, regarding the sale of Lot 2.  Husband instructed Graham to strike through his name on the contract, and replace it with the other two partners' names.  Husband explained in that email that he couldn't sell the property because of the divorce, but since Husband only owned 33% of Goodman Malone, the other 66% "can do whatever they want without my permission."  Husband then expressed his approval of the terms.  Then, Husband stated that "after the divorce is finalized, I'd like to be paid a standard commission of 6% on the sales proceeds after the detention area is resolved."

**Trial Exhibit 259 is the proverbial smoking gun, and it refutes Husband's sworn testimony entirely.  Not only did Husband authorize the sale of Lot 2, he orchestrated the cover-up** . . . .

Husband's part in the sale of Lot 2 was in willful violation of the statutory injunctions.  It was also a willful violation of this Court's December 16, 2013 Order, which enjoined Husband from "entering into any contracts to sell real estate or business without first obtaining [Wife's] approval or Court approval."  As such, this constitutes another count of criminal contempt.  Husband's failure to disclose the sale constituted another willful violation of this Court's September 22, 2015 Order.  That constitutes yet another count of criminal contempt.  This brings Husband's total thus far to eight counts.

(Emphasis added) (internal citations omitted).

Regarding Count 7, in which the trial court determined that Husband willfully violated the statutory injunctions and the court's December 16, 2013 order by selling Lot 2 of the Shops of Southaven without approval, Husband continues to assert on appeal that

he is not guilty on this count because his business partners were the ones who actually signed the closing documents for the sale of Lot 2. However, the trial court went into careful detail to explain its finding that Husband not only arranged for the sale of Lot 2, he also "orchestrated the cover-up" by expressing his approval of the terms of the sale and then having his lawyer strike through his name and replace it with his partners' names. We reject any contention that Husband may circumvent orders of the trial court by using his partners to violate the injunctions on his behalf. We affirm the trial court's findings with respect to Count 7 of criminal contempt.

Count 8 relates to the same set of facts, but the court found Husband guilty of an additional count of criminal contempt for failing to disclose the sale of Lot 2 in violation of the court's order entered September 22, 2015. Husband argues that this conviction was in error because the plain language of the September 2015 order did not require him to disclose the sale of any property. The order did, however, require "the parties to file, under oath by September 25, 2015, a physical description of each property, the value placed by each party on the property or [entities], if the property has been appraised, the name of the appraiser, when the appraisal was made and the appraisal value disclosed." Furthermore, the title of the court's order was "Order Granting Plaintiff's Motion to Require Parties to Provide Information to the Court as to Certain Facts Surrounding Each and Every Piece of Real Estate and Entity Owned by the Parties." In reviewing the order alleged to have been violated, we take into account not only the language of the order but also "the circumstances surrounding the issuance of the order, including the audience to whom the order is addressed." *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 354 (Tenn. 2008). Our review of the circumstances surrounding the issuance of this order and violation of this order supports the trial court's conclusion that Husband may be found guilty of contempt for failing to disclose the sale of Lot 2. Despite Husband's assertions to the contrary, the trial court reasonably concluded that Husband orchestrated the sale of Lot 2 by a company in which Husband owned an interest. We determine that the trial court had a sufficient basis upon which to find Husband guilty of Count 8 of criminal contempt.

F.     Olivia's Square (Count 9)

Count 9 of criminal contempt against Husband relates to another finding by the trial court that Husband willfully violated the September 22, 2015 order of the court requiring the parties to provide information, including appraisal values, for properties owned by the parties. With respect to this count of contempt, the trial court held as follows:

> Husband had Olivia's square appraised in June of 2015. Husband caused only 3.24 acres (otherwise known as Lot 9) to be appraised in conjunction

with the Olivia's Square appraisal. Those 3.24 acres were appraised for $2,845,000. As such, in response to this Court's Order of September 22, 2015, Husband reflected that the full value of Olivia's Square was $2,845,000.

However, the June 2015 appraisal of Olivia's Square did not include Lot 8. The tax assessor indicated that Lot 8 had a value of its own of $131,495.

Husband's failure to disclose Lot 8 constituted a willful violation of this Court's September 22, 2015 Order. That constitutes yet another count of criminal contempt. This brings Husband's total thus far to nine counts.

(Internal citations omitted.)

Husband asserts that there is insufficient proof to sustain the conviction against Husband for Count 9 of criminal contempt. More particularly, he contends that he did not intentionally withhold the valuation of Lot 8 from the Court. To support this contention, Husband points to the testimony of Rip Walker, the appraiser for the property, who testified that he had previously done an appraisal for this property at the request of a bank, and that the bank did not want Lot 8 to be included in the appraisal. Husband also directs this Court to the testimony of his assistant, Cheryl Middleton, in which Ms. Middleton asserts that this information was not intentionally withheld from Wife.

However, the trial court heard the testimony of Mr. Walker and Ms. Middleton in person at trial and still came to the conclusion that Husband willfully violated the court's order requiring him to disclose all information regarding, among other things, the Olivia's Square property. This is consistent with several other findings of the court in which it determined that Husband failed to have entire properties appraised but provided the incomplete appraisal to the court as though it reflected the entire value of the property. In our view of the record, the trial court had a sufficient basis to find Husband willfully violated its September 22, 2015 order by willfully failing to disclose the entire value of Olivia's Square. We, therefore, affirm Count 8 of criminal contempt against Husband.

G.     Cayman National Bank (Count 10)

Husband next argues that the trial court erred in finding him guilty of criminal contempt for not producing information related to his Cayman Island business affairs as had been previously ordered by the court. On this issue, the trial court found as follows:

41

Paragraphs One through Five of this Court's Order of September 22, 2015 provided detailed requirements for Husband to produce documentation regarding his Cayman Island loans and payment since January 1, 2012. Those documents were actually ordered to be produced to counsel for Wife by September 22, 2015. As of October 14, 2015, Husband still had not produced same. As such, Wife was required to file a Petition for Contempt to secure performance. Husband's failure to produce the documentation by September 22, 2015 as ordered constitutes another count of criminal contempt. This brings Husband's total thus far to ten counts.

(Internal citations omitted.)

Husband's defense to this charge on appeal is essentially that, because Wife eventually was given all of the information to which she was entitled, albeit after she was forced to file a motion for contempt, he should not be held accountable for failing to abide by the court's order. Husband does not provide any explanation as to why, once again, he failed to comply with an order of the court until after Wife filed a petition for contempt. According to Husband, the court could not infer that this failure to produce the requested information was willful on his part. We disagree. The record contains adequate evidence upon which the trial court could determine that, in light of Husband's pattern of contemptuous behavior, he willfully violated the court's September 22, 2015 order by not producing the court-ordered information. We affirm the trial court's finding on Count 10 of criminal contempt.

H.    Company Emails (Count 11)

On August 14, 2014, Wife filed a motion to compel Husband to reinstate Wife's administrative authorization privileges to access company email accounts at Trezevant Enterprises, Inc. and any related entities. Husband, who was representing himself at the time, opposed Wife's motion, stating in part that "Wife has never had administrative authorization privileges to any business email account for [Trezevant] Enterprises, Inc. or any other business Husband is associated with." Husband even went so far as to say that Wife's suggestion that she had access to business emails in the past was "another attempt by Wife to imply facts that don't exist or misstate the truth."

By order entered on September 22, 2015, the trial court granted Wife's motion and required Husband to do the following:

[Husband] is to allow [Wife] . . . access to all emails not covered by attorney/client privilege or other privilege since the date the divorce was filed; arrangements are to be made between counsel for this to take place

42

and to insure the integrity of the emails; in the event the parties cannot agree, the matter shall be submitted to this Court and this Court shall then set up appropriate guidelines.

In the Final Decree, the court held Husband in contempt for willfully failing to restore Wife's access to her business email account:

> The September 22, 2015 Order obligated Husband to allow Wife "access to all emails pertaining to the companies and entities since the date the divorce was filed." Husband testified as follows during the trial.
>
> "Mr. Moscovitz, she never had e-mail – she never had business email. . . . Kisha had kisha@aol.com. She's never had access to e-mails, period."
>
> Once again, documentary evidence presented at trial revealed that Husband's testimony in this regard was simply not correct. Trial Exhibit 261 was an email from Husband to Wife, dated August 21, 2013. **The subject line was entitled "kisha@trezevant.com." In the body of the email, Husband informed Wife that she had "been removed to use the above address."**
>
> Husband's failure to restore Wife's email access was in willful violation of the September 22, 2015 Order. This constitutes another count of criminal contempt. This brings Husband's total thus far to eleven counts.

(Internal citations omitted) (emphasis added).

On appeal, Husband argues that the order of the court was not clear enough for him to be held in contempt for not allowing Wife access to her email accounts. However, as we have previously stated, "[o]rders alleged to have been violated should be construed using an objective standard that takes into account both the language of the order and the circumstances surrounding the issuance of the order, including the audience to whom the order is addressed." *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 354 (Tenn. 2008). Given the nature of the petition filed by Wife and the record of proceedings surrounding the trial court's order, including Husband's incorrect assertion that Wife had no work email account, the court's order was sufficiently clear for Husband to have known that he was required to restore Wife's access to her email. Given this, we cannot disagree with the trial court's finding of contempt. We affirm the trial court's finding of contempt against Husband on Count 11.

I.    Life Insurance (Count 12)

During the pendency of the divorce proceedings, Wife learned that Husband maintained a $500,000.00 life insurance policy on his life, which was payable to the parties' daughters upon his death. On September 22, 2015, the court granted Wife's motion to require Husband to either change the beneficiary designation to Wife on this policy or to purchase a comparable policy naming Wife as the beneficiary of the new policy.[47] Husband apparently did not comply with this order of the court, and the trial court found as follows:

The September 22, 2015 Order likewise required Husband to designate Wife as the beneficiary of $500,000 worth of life insurance on Husband's life, or alternatively to buy a comparable policy. The Order required Husband to accomplish the same within thirty days of August 28, 2015.

Husband stated repeatedly at trial that he provided this policy to counsel for Wife in court, on September 12, 2016, at the commencement of this divorce trial. However, the folder that Husband provided to counsel for Wife on September 12, 2016 was marked into evidence. That folder contained Husband's hand written note that Husband was "missing new life insurance policy," and that Husband "will provide at contempt hearing."

It does appear that, on the second day of trial, Mr. Fishman handed the Court a policy of life insurance for $500,000, with an effective date of February 22, 2016. That policy appears to have been marked as Trial Exhibit 70.

As this Court pointed out at trial, Husband was ordered to have this policy by September 27, 2015. Apparently, Husband did not procure this policy until February 22, 2016. Husband's failure to timely secure this insurance constitutes another count of criminal contempt. This brings Husband's total thus far to twelve counts.

(Internal citations omitted.)

Husband asserts that there is insufficient proof to sustain a conviction for criminal contempt against him on this count. According to Husband, "the trial court heard only the arguments of counsel and no testimony from any witnesses about the status of Husband's life insurance policies. Without any competent proof that Husband violated

---

[47]The Order was entered *nunc pro tunc* to August 28, 2015.

this Order, this conviction should be overturned." In support of his argument, Husband cites the case of *State v. Henretta*, 325 S.W.3d 112, 131 (Tenn. 2010), for the proposition that the arguments of counsel do not constitute proof. However, Trial Exhibit 70 was the $500,000.00 life insurance policy submitted by Husband's counsel to the court on the second day of trial. This policy showed an effective date of February 22, 2016, although Husband had been ordered to procure this policy by September 27, 2015. In fact, Husband does not even argue on appeal that he did actually comply with the court's order and properly secure a life insurance policy for the benefit of his Wife within the required time frame. There is sufficient evidence in the record to support the trial court's finding of contempt on this issue, and we therefore affirm the trial court's finding of Husband's guilt as to count Count 12.

K.     <u>False Representation Regarding Amount of Taxes Owed</u> (Count 13)

Count 13 of criminal contempt against Husband is another one of several counts of contempt related to what the trial court found to be Husband's intentional misrepresentations to the court throughout the divorce proceedings. Count 13 deals specifically with Husband's requests of the court to allow him to encroach into funds held in escrow for the purposes of paying the parties' property taxes. The court eventually determined that, not only was Husband misleading the court about the amount of taxes owed, he was also simultaneously concealing substantial assets that could have been used to pay these taxes. In the Final Decree, the trial court detailed the following findings related to Count 13:

> On December 4, 2015, Husband filed a Motion with this Court. Husband alleged in Paragraph One of that Motion that real estate taxes will be due and owing on the parties' properties in excess of $600,000 on or before February 1, 2016. Husband submitted an Affidavit, wherein he swore under oath that the allegations in that Motion were accurate.
>
> Husband appeared in Court on December 15, 2015 regarding this Motion. At that hearing (and under oath), Husband plainly and unequivocally testified as follows. "I have $600,000 in property taxes due." Husband spoke of urgent and dire consequences if he was not allowed access to the funds held in his attorney's escrow account.
>
> The Court expressly finds that Husband's sworn statements in the Motion and in open Court were not accurate. Wife incurred considerable attorney fees for her attorney to investigate Husband's sworn claims. Wife's counsel concluded that the unpaid portion of the taxes was only $215,998.83, approximately $384,000 less than Husband had represented to

the Court.

Mr. Dilley, Husband's auditor, did not know, nor was he informed, that Husband had already paid $440,000 in real estate taxes in the final quarter of 2015. He learned that in Court on February 5, 2016. So, the Court instructed Mr. Dilley to investigate this issue further. On February 25, 2016, Mr. Dilley confirmed in a letter that Wife's counsel was correct. That letter stated, in pertinent part, that "[t]he above unpaid amount of $215,998.83 agrees exactly to the unpaid amount provided by [Wife's] attorneys." He further discovered information on two bank accounts, neither of which were provided to him earlier, from which the taxes were paid.

The proof further reflected that, at this very same time, Husband had over $411,000 deposited in the Cayman Islands. Husband failed to disclose those funds until August 30, 2016. Mr. Dilley testified that he did not know about this $411,000 in February 2016, but that he would have wanted to know this before coming to court on Husband's behalf on the issue of taxes in February 2016.

This Honorable Court expressly finds that Husband attempted to deceive this Honorable Court with respect to the alleged amount of taxes owed, as well as bank accounts and monies on deposit. As such, this Honorable Court believes that the same constitutes another count of contempt. This brings Husband's total thus far to thirteen counts.

(Internal citations omitted.)

On appeal, Husband asserts that the trial court erred in holding him in contempt on Counts 13, 14, 15, 16 17, and 18, which are all generally based on Husband's intentional misrepresentations to the trial court. Husband argues that "[m]aking a false statement to a court, by itself, is not sufficient to sustain a conviction for criminal contempt." In support of this proposition, Husband cites to the case of *Maples v. State,* 565 S.W.2d 202, 204 (Tenn. 1978). While true, this statement cannot be considered in a vacuum. The *Maples* court did not hold that a misrepresentation to a court cannot be the basis for criminal contempt. *Id.*

In *Maples*, a husband admittedly instituted fraudulent divorce proceedings by lying about the county in which his wife resided. *Maples*, 565 S.W.2d at 202. The husband filed a complaint for divorce in Union County, Tennessee, wherein he made sworn allegations that his wife was a resident of that county. *Id.* The husband then

46

testified at an oral hearing that his wife was a resident of Union County. *Id.* He was eventually awarded a divorce. *Id.* The husband's ex-wife subsequently died, and the husband filed a petition pursuant to the Tennessee Rule of Civil Procedure 60, requesting that the court set aside the divorce decree because it had been based on his false testimony that he and his wife were residing in Union County at the time. *Id.* The trial court did set aside the divorce, but it also found the husband guilty of contempt of court for committing fraud upon the court. *Id.* Husband was later indicted on a charge of perjury based on his false testimony at the divorce hearing. *Id.* at 203. The Tennessee Supreme Court was then required to determine whether husband's charges of criminal contempt and perjury, which were based on the same false testimony at the divorce hearing, violated the constitutional prohibition against double jeopardy. *Id.* The *Maples* court held that, in light of the facts of the case at hand, a summary criminal contempt finding did not prevent criminal prosecution for perjury based on the same conduct under principles of double jeopardy. *Id.* at 204.

Returning to Husband's contention that false statements alone are not sufficient for a finding of contempt, the *Maples* court did distinguish the charge of perjury from criminal contempt by noting that contempt requires an additional element of obstruction of justice or interference with the process of the court. *Id.* Based the volumes upon volumes of pleadings and transcripts of hearings in this case devoted to clearing up the confusion caused by Husband's misrepresentations of the contents and value of the parties' estate, we conclude that there is sufficient proof that Husband's misconduct hindered and obstructed the court in its administration of justice. We affirm Count 13 of criminal contempt against Husband.

L.     False Financial Statements (Counts 14, 15, 16, and 17)

The trial court also found Husband guilty of four additional counts of criminal contempt for "deliberately misrepresent[ing]" his domestic net worth to the court on four separate occasions. On these misrepresentations, the trial court found as follows:

Trial Exhibit 73 reflects that, during these divorce proceedings, Husband provided markedly different financial statements to the Court than he was providing to his lenders. Again, that Trial Exhibit is summarized as follows (which, again, excludes the Cayman Island properties)

| DATE | TO WHOM SUBMITTED | NET WORTH |
|------|-------------------|-----------|
| 9/1/2013 | Court | $9,595,290.17 |

47

| 12/31/2013 | Bank | $31,085,430.05 |
|------------|------|----------------|
| 3/10/2014 | Court | $7,623,160.30 |
| 1/31/2015 | Bank | $25,196,030.32 |
| 6/28/2015 | Court | $8,653,178.33 |
| 8/01/2015 | Bank | $25,901,640.28 |
| 8/31/2015 | Court | $11,072,911.98 |

This Honorable Court expressly finds that Husband deliberately misrepresented his domestic net worth to this Court on September 1, 2013, March 10, 2014, June 28, 2015, and again on August 31, 2015. That constitutes four additional counts of criminal contempt. That brings Husband's total thus far to seventeen counts.

(Internal citations omitted.)

Husband asserts that he cannot be held in contempt based on the trial court's findings for Counts 14-17 because they concerned only Husband's opinions of his net worth. According to Husband, because an opinion is not a statement of fact, it cannot form the basis for a finding of criminal contempt against him. Husband fails to cite any law to support this assertion other than a 1972 case about equitable estoppel. *See Ryan v. Lumbermen's Mut. Cas. Co.*, 485 S.W.2d 548, 550-51 (Tenn. 1972) (noting that "ordinarily misrepresentations of law, being nothing more than opinions of the person making them, cannot be the basis of an equitable estoppel."). Furthermore, the trial court did not find Husband to be in criminal contempt for accidentally miscalculating his net worth or giving a mistaken opinion that was made in good faith. Rather, the court determined that Husband made a deliberate choice to undervalue his net worth in his representations to the trial court. In our view of the record, the evidence does not preponderate against the trial court's findings on this point.

Husband also reasserts the same argument that he made with respect to Count 13, in that his misrepresentations did not hinder the trial process. For the same reasons we explained in our analysis of Count 13, we reject this contention with respect to Counts 14, 15, 16, and 17, and hold that the trial court had ample basis to determine that Husband's deliberate misrepresentations to the court obstructed the court's ability to carry out its duties and detracted from the authority of the court. We affirm the trial court's findings of criminal contempt against Husband for Count 14, Count 15, Count 16 and Count 17.

M.    Misrepresenting Holdings to the Court (Count 18)

Husband next asserts that this Court should reverse the trial court's finding of criminal contempt against him on Count 18.  Finding that Husband again made a deliberate misrepresentation to the court, the trial court held the following:

> In his effort to deceive the Court into releasing $384,000 for taxes that have already been paid, Husband caused Mr. Dilley to prepare a report which Husband submitted to the Court.  That report revealed that Mr. Dilley was not aware of Husband's bank accounts at SecurTrust Federal Credit Union and Sycamore Bank.  Mr. Dilley was not aware of those accounts until he did research for the letter requested by the Court.

> Trial Exhibit 75 demonstrates that Husband falsely represented his financial condition in an attempt to secure funds.  This is, in turn, an additional count of contempt.  This brings Husband's total thus far to eighteen (18) counts of criminal contempt.

(Internal citations omitted.)

Husband argues that Count 18 of contempt should be reversed for the same reasons he gave related to Count 13.  We reject those arguments with respect to Count 18 on the same bases outlined in our analysis of Count 13 above.  Moreover, Husband contends that Count 18 of criminal contempt should be reversed because it is duplicative of Count 13.  However, in our view, Husband committed two separate acts that constitute contempt.  There is evidence to support a finding that he lied about the amount of taxes that were due on the parties' real property, including concealing information from his auditor.  There is also sufficient evidence that Husband intentionally withheld information that he had approximately $411,000.00 in a Cayman Island account at the same time he represented to the court that he was in dire need of money to pay these taxes.  Husband's actions in this regard are sufficient to form the basis for both Count 13 and Count 18 of criminal contempt.  We affirm the trial court's findings on Count 18.

N.    305 Kisha Condominium Complex (Count 19)

On September 19, 2014, the trial court entered a consent order granting Wife's petition for civil and criminal contempt against Husband.  Therein, Husband agreed that he was in criminal contempt for executing an option and sale agreement for Unit 305 of the Kisha Condominium complex in the Cayman Islands.  He also agreed that he was in civil contempt for failing to comply with the divorce referee's order and agreed to make purge payments in the amount of $290,000.00 and to pay a portion of Wife's attorney's

fees. The issue of sentencing was reserved. In the Final Decree, the trial court addressed this contempt finding as follows:

> In Paragraph One (1) of this Court's September 19, 2014 Consent Order, this Honorable Court found Husband in contempt by virtue of Husband entering into a Consent order.

Husband does not appear to make any argument on appeal related to the merits of this contempt finding. We therefore affirm Count 19 of criminal contempt against Husband.

SENTENCING FOR CRIMINAL CONTEMPT

In addition to Husband's arguments as to the merits of his convictions, Husband contends that the trial court committed reversible error by failing to follow the requirements for sentencing in cases of criminal contempt. According to Tennessee Code Annotated section 29-9-103: "(a) The punishment for contempt may be by fine or by imprisonment, or both. (b) Where not otherwise specifically provided, the circuit, chancery, and appellate courts are limited to a fine of fifty dollars ($50.00), and imprisonment not exceeding ten (10) days . . ." The trial court's determination of sentencing for Husband's contempt was as follows:

> The Court reserved the sentencing for Husband's contemptuous execution of an Option and Sale Agreement for Unit 305 of the Kisha Condominium Complex. The Court had hoped that a contempt finding with reserved incarceration would encourage honest dealings and representations to the Court and counsel in this litigation. Unfortunately, the Court's indulgence did nothing to deter Mr. Trezevant. This Court hereby sentences Husband to serve ten days for criminal contempt as a result of the Petition heard on September 19, 2014.
>
> In addition to the contempt found above, the Court finds Mr. Trezevant guilty of 18 additional contemptuous acts as set forth herein. This Court finds that Mr. Trezevant could be caused to serve 180 days for all 18 counts of contempt, in addition to the previously reserved 10 day sentence, in the Shelby County jail, but this Court is cognizant of the fact that Mr. Trezevant must conduct his business to produce income. However, this Court finds Mr. Trezevant's activities to be an example of blatant disregard for the authority of this Court's Orders and therefore requiring a substantial sentence. Apparently, Mr. Trezevant needs further and more stringent punishment to make an impression upon him. Each incarceration should

and must be more than the prior one, until Mr. Trezevant understands that he, and any other litigant who appears in a court of law, must abide by the orders of that court unless and until a superior court overturns such order.

The total sentence is fifty-five (55) days to be served as follows[:]

Thirty-five (35) days consecutively, including ten (10) days from the September 2014 contempt and twenty-five days from the remaining 18 contempt findings. The remaining twenty (20) days may be served on the weekends . . . to report at 6:00 p.m. each Friday through Sunday at 6:00 p.m., for 20 days to complete the 55 day total sentence. If Husband arrives late, or is refused entrance to the penal farm for any violation, he shall immediately serve his remaining sentence on consecutive days until completed.

Husband asserts that the trial court committed reversible error by neglecting to consider the statutory factors in Tennessee Code Annotated section 40-35-115(b) in its decision to impose consecutive sentences. The determination of whether to require Husband to serve his sentences concurrently or consecutively is a matter left to the sound discretion of the trial court. This Court has addressed that issue fairly recently in the case of *Simpkins v. Simpkins*:

As *Sneed* instructs, we look to the sentencing considerations set forth in Tennessee Code Annotated § 40-35-103 for guidance, wherein the General Assembly states:

(1) Sentences involving confinement should be based on the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant;

51

(2) The sentence imposed should be no greater than that deserved for the offense committed;

(3) Inequalities in sentences that are unrelated to a purpose of this chapter should be avoided;

(4) The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed;

(5) The potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed. The length of a term of probation may reflect the length of a treatment or rehabilitation program in which participation is a condition of the sentence; and

(6) Trial judges are encouraged to use alternatives to incarceration that include requirements of reparation, victim compensation, community service or all of these.

Although the record clearly established Husband's guilt of all fourteen counts of criminal contempt, that fact alone does not justify the imposition of the maximum sentence of ten days for each conviction or that all of the sentences run consecutively to each other for an effective period of confinement of 140 days. To the contrary, there is a presumption in favor of concurrent sentencing as distinguished from consecutive sentencing. *See State v. Taylor*, 739 S.W.2d 227, 230 (Tenn.1987) (holding that consecutive sentences should not routinely be imposed in criminal cases and the aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses involved). Further, the record suggests the trial court did not consider the statutory criteria when determining whether Husband's multiple sentences should be served concurrently or consecutively. *See* Tenn.Code Ann. § 40-35-115(a) ("If a defendant is convicted of more than one (1) criminal offense, the court shall order sentences to run consecutively or concurrently as provided by the criteria in this section."). Tennessee Code Annotated § 40-35-115(b) provides that the court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

The only statutory factor that applies to Husband is that he is sentenced for criminal contempt. While this may justify consecutive sentencing, at least in part, this factor alone does not justify the imposition of the absolute maximum sentence of 140 days. As we noted above, "[a]lthough statutory criteria may support the imposition of consecutive sentences, the overall length of the sentence must be 'justly deserved in relation to the seriousness of the offense[s],' and 'no greater than that deserved' under the circumstances." *In re Sneed*, 302 S.W.3d 825, 828 (Tenn. 2010) (internal citations omitted).

*Simpkins v. Simpkins*, 374 S.W.3d 413, 423-25 (Tenn. Ct. App. 2012).

We find nothing in the trial court's order of sentencing that is inconsistent with the statutory and case law directives outlined above. We acknowledge that there is a presumption in favor of concurrent sentencing for convictions of criminal contempt. This Court has the ability to modify a sentence that it considers to be excessive. *See Thigpen v. Thigpen,* 874 S.W.2d 51, 54 (Tenn. Ct. App. 1993). For example, in the *Simpkins* case, this Court agreed that the evidence was sufficient for a finding of guilt on fourteen separate counts of criminal contempt. *See Simpkins,* 372 S.W.3d at 420-21. We determined, however, that the imposition of the maximum sentence possible was excessive and modified the sentence for contempt from 140 days to 49 days in jail. *Simpkins,* 372 S.W.3d at 425-26. In *Burris v. Burris*, 512 S.W.3d 239 (Tenn. Ct. App. 2016), the trial court found the appellant guilty of thirty-seven counts of criminal contempt and ordered that she serve 403 days in jail. This Court vacated that sentence because the trial court failed to consider whether the sentence was excessive in light of *Simpkins*. *Burris*, 512 S.W.3d at 257-58. However, those cases are distinguishable from the case at bar. The maximum jail time Husband could have received would have been 190 days. He received less than half of that amount for his egregious behavior articulated above. We find nothing excessive in this sentence. In fact, Husband never even articulates why or how the sentence is excessive. Furthermore, in *In re A.J.*, we noted that:

> In creating a consecutive sentence, the trial court relied on the statutory criteria set out at Tennessee Code Annotated Section 40-35-115(b)(7) that consecutive sentences may be imposed when a defendant is found guilty of contempt.
>
> **This Court has previously upheld consecutive sentencing when the only statutory factor present in the case was that the defendant had been sentenced for contempt.**

*In re A.J.*, No. M2014-02287-COA-R3-JV, 2015 WL 6438671, at *4-5 (Tenn. Ct. App. Oct. 22, 2015) *(citing Simpkins*, 374 S.W.3d at 425-26) (emphasis added).

Husband also points this Court to statements made by the trial court after the Order was entered for the proposition that the trial court did not give adequate consideration to the sentencing criteria. Husband pointed out repeatedly in his brief and in oral argument that, with respect to other issues he raises on appeal, this Court should not consider the statements by the trial court that were neither included in the Order nor incorporated by reference therein. We decline Husband's attempts to now use post-Order statements by the trial court in support of his position.

54

Husband also states in his brief that the trial court, in its Order, made "only vague findings as to Husband's 'blatant disregard for the authority of this Court's Orders' and that Husband 'needs further and more stringent punishment to make an impression on him.'" According to Husband, the trial court's lack of specificity in determining its sentence prevents this Court from engaging from any meaningful review of the sentence. We disagree and find that the history of Husband's activity in this case provided a sufficient basis for this finding by the trial court.

We find no abuse of discretion in the trial court's holding on Husband's nineteen counts of criminal contempt and the method and manner of his sentencing thereon.

### 7. Wife's Attorney's Fees on Appeal

Wife has requested that this Court award her attorney's fees on appeal. The determination of whether to award attorney's fees on appeal is within the sole discretion of the appellate court. *Moses v. Moses*, E2008-00257-COA-R3-CV, 2009 WL 838105, at *10 (Tenn. Ct. App. Mar. 31, 2009) (*no perm. app. filed*) (citing *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995)). After considering Wife's request, and in light of the outcome of this appeal, we respectfully decline to do so.

### IV. CONCLUSION

For the foregoing reasons, we affirm the trial court's identification and classification of marital property, as well as the trial court's findings and sentencing related to Husband's criminal contempt. We vacate the trial court's valuation and distribution of the parties' marital property and awards of alimony. We remand the case to the trial court for further proceedings consistent with this Opinion. Costs of this appeal are taxed one-half to the appellee, Kisha Dean Trezevant, and one-half to the appellant, Stanley H. Trezevant, III, and his surety, for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE