FILED

12/07/2022

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 16, 2022 Session

## AMANDA N. BURNETT v. AARON L. BURNETT

**Appeal from the Chancery Court for Anderson County**
**No. 18CH422       M. Nicole Cantrell, Chancellor**

___

### No. E2021-00900-COA-R3-CV

___

In this divorce action, Aaron Burnett ("Husband") challenges the trial court's classification and division of the parties' assets, award of alimony in solido to Amanda Burnett ("Wife"), and permanent parenting plan ("PPP"). Husband also argues that the trial court erred in finding him in criminal contempt during the divorce trial. The PPP ordered by the court states that Husband is granted 90 days of parenting time per year, but the more specific day-to-day schedule provided in the plan allows for only about 63 days. Wife concedes that the PPP is inconsistent and also that the trial court improperly found Husband in contempt. Consequently, we vacate the day-to-day schedule in the PPP and remand for the trial court to craft a schedule that allows Husband 90 days, and we reverse the contempt finding. The trial court's judgment is affirmed in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed in Part and Vacated in Part; Case Remanded**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and THOMAS R. FRIERSON, II, J., joined.

Patti Jane Lay, Knoxville, Tennessee, for appellant, Aaron Burnett.

Katheryn M. Ogle and Carolyn L. Gilliam, Knoxville, Tennessee, for appellee, Amanda Burnett.

### OPINION

### I. BACKGROUND

The parties were married on May 30, 2010. They have three children: Carolina (born 1/6/2012), and twins Piper and Paxton (born 8/23/2013). Wife filed this action for divorce on June 25, 2018. The parties submitted a temporary parenting schedule agreement whereby Wife had custody and Husband parenting time "on his days off, up to two nights per week." This was the schedule followed by the parties until the trial court entered its final decree following a three-day trial that took place in August and October of 2020. The trial court granted Wife the divorce on the grounds of inappropriate marital conduct, citing Husband's cocaine use, extramarital sexual relationship, and verbal abuse of Wife.

During the time between the filing of the divorce complaint and trial, Husband stopped paying the mortgage on the marital residence and certain other family bills, and he declared bankruptcy. The trial court divided the assets of the marital estate, valued at $50,456.72, as follows: Husband $21,671.36 (43%); Wife $28,785.36 (57%). Marital debt was assigned to Husband in the amount of $4,300 and Wife $1,280. Husband received 38.7% of the net value of the marital estate, and Wife 61.3%. The trial court found "neither party has any separate property of substantial value." Each party bought one significant item after separation – Husband a vehicle and Wife some furniture – and the court classified these assets as separate and assigned the debt for each to the party who bought it. The court found Husband guilty of dissipation of the marital estate by burning some personal items and selling some and giving some away without Wife's permission.

Regarding spousal support, the trial court found Wife to be economically disadvantaged. Wife was a stay-at-home parent and homemaker since 2013. She worked part-time as a teacher of English as a second language since 2017. Wife filed an affidavit showing income of $1,592 per month and expenses of $2,979 per month, a $1,387 deficit. Husband worked full-time for the US Postal Service. His affidavit showed income of $3,772 per month. The trial court found that his statement of expenses was inaccurate because he was living with his girlfriend and sharing expenses.

The court found that "the Wife was not given access to the parties' marital funds and that she had difficulty even providing sufficient groceries and necessities to provide for the children even though [Husband] was working because she did not have access to these funds." Because Wife was living with a third person, her father, and did not rebut the statutory presumption that she did not need transitional alimony, the trial court did not award any. The court did award alimony in solido to Wife in the form of her attorney's fees ($9,840) and litigation costs ($1,640.70), totaling $11,480.70.

The trial court approved the PPP submitted by Wife, which designates her as primary residential parent with decision-making authority, and grants Husband 90 days per year of co-parenting time. However, as already noted and will be discussed further below, the day-to-day schedule specified by the PPP only provides for about 63 days per year. The

trial court awarded child support to Wife in accordance with the guidelines.  The child support award is not an issue on appeal.

The trial court found Husband guilty of one count of criminal contempt, stating that he "willfully disobeyed this court instruction and commands to not discuss this case with any of the witness[es] waiting to testify in this matter who were instructed to wait outside the courtroom . . . During a break, [Husband] was overheard by an officer of the court discussing the proof of the case with his waiting witness, Lynn Bluder."

## II. ISSUES

Husband timely appealed and raises the following issues:

1.     Whether the trial court erred in classifying, valuing, and dividing the parties' assets and debts.

2.     Whether the trial court erred in awarding spousal support in the form of Wife's attorney's fees and costs as alimony in solido.

3.     Whether the trial court erred in entering a permanent parenting plan that provides substantially less time than what the parties agreed to in their temporary parenting plan and that grants Wife sole decision-making authority.

4.     Whether the trial court erred in finding Husband in contempt for alleged violation of the sequestration rule.

## III. ANALYSIS

### A. Classification and Division of Assets

Husband challenges the trial court's classification and division of assets and debts. Our Supreme Court has defined the applicable standard of review of issues regarding property classification and division in divorce proceedings:

> The classification of particular property as either separate or marital is a question of fact to be determined in light of all relevant circumstances. *See Langford v. Langford*, 220 Tenn. 600, 421 S.W.2d 632, 634 (1967); *Cutsinger v. Cutsinger*, 917 S.W.2d 238, 241 (Tenn. Ct. App. 1995).  This Court gives great weight to a trial court's decisions regarding the division of marital assets, and we will not disturb the trial court's ruling unless the distribution lacks proper evidentiary support, misapplies statutory requirements or procedures, or results in some error of law.  *Keyt v. Keyt*,

3

244 S.W.3d 321, 327 (Tenn. 2007). As to the trial court's findings of fact, "we review the record de novo with a presumption of correctness, and we must honor those findings unless there is evidence which preponderates to the contrary." *Id.* However, we accord no presumption of correctness to the trial court's conclusions of law. *Id.*

*Snodgrass v. Snodgrass*, 295 S.W.3d 240, 245-46 (Tenn. 2009).

The trial court must classify all of the assets possessed by the divorcing parties as either separate or marital before equitably dividing the marital estate. *Larson-Ball v. Ball*, 301 S.W.3d 228, 231 (Tenn. 2010). "Separate property is not part of the marital estate and is therefore not subject to division." *Id.*

After classifying and valuing marital property, a trial court must equitably divide it between the parties. *See* Tenn. Code Ann. § 36-4-121(a)(1); *Luplow v. Luplow*, 450 S.W.3d 105, 109 (Tenn. Ct. App. 2014) (citing *Miller v. Miller*, 81 S.W.3d 771, 775 (Tenn. Ct. App. 2001)). An equitable division of marital property does not require that the property be divided equally. *Id.* at 109-10 (citing *Robertson v. Robertson*, 76 S.W.3d 337, 341 (Tenn. 2002)). Nor does it require that each party receive a share of every item classified as marital property. *Morton v. Morton*, 182 S.W.3d 821, 833-34 (Tenn. Ct. App. 2005) (quoting *King v. King*, 986 S.W.2d 216, 219 (Tenn. Ct. App. 1998)). According to Tenn. Code Ann. § 36-4-121(c),

In making equitable division of marital property, the court shall consider all relevant factors including:

(1) The duration of the marriage;
(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;
(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;
(4) The relative ability of each party for future acquisitions of capital assets and income;
(5)(A) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;
    (B) For purposes of this subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to

the marriage either before or after a complaint for divorce or legal separation has been filed.

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party . . . ;

(10) In determining the value of an interest in a closely held business or similar asset, all relevant evidence, . . . .

(11) The amount of social security benefits available to each spouse; and

(12) Such other factors as are necessary to consider the equities between the parties.[1]

The trial court has broad discretion in devising an equitable division of marital property. *Flannary v. Flannary*, 121 S.W.3d 647, 650 (Tenn. 2003). This Court will not overturn the trial court's determination unless "it is inconsistent with the statutory factors or lacks proper evidentiary support." *Trezevant v. Trezevant*, 568 S.W.3d 595, 607 (Tenn. Ct. App. 2018) (citing *Baggett v. Baggett*, 422 S.W.3d 537, 543 (Tenn. Ct. App. 2013)).

In the present case the trial court made specific findings regarding each of the above statutory factors. The court found as follows, in pertinent part:

These parties were married in 2010, making this a 10-year long marriage. The Wife is 37 years old and the Husband is 36 years old. Both parties are of sound physical and mental health such that they are both capable of working. The Wife has a Bachelor's Degree and has previously been employed in an afterschool program. The Husband has a high school diploma and is employed full time by the U.S. Postal Service. Neither party has any separate property of substantial value.

The Wife has been a stay at home mother since May of 2013 when she was pregnant with the parties' twins. It was agreed by the parties that she would no longer work and stay home with the three children. The Wife has been employed with VIP Kids since 2017, teaching English as a foreign language online making $21.00 per hour for an average of 17.5 hours per week for a monthly wage of $1,592.00. The Husband is currently employed by the U.S.

---

[1] In an amendment to this statute that became effective on March 31, 2022, our legislature added a thirteenth factor: "The total amount of attorney fees and expenses paid by each party in connection with the proceedings; whether the attorney fees and expenses were paid from marital property, separate property, or funds borrowed by a party; and the reasonableness, under the factors set forth in Rule 1.5 of the Tennessee Rules of Professional Conduct, and necessity of the attorney fees and expenses paid by each party." Tenn. Code Ann. § 36-1-121(c)(13).

Postal service making $20.00 per hour working 5 days a week on a 4:00 pm-12:30am schedule. His average monthly income according to his affidavit is $3,772.00 per month. Both parties are relatively young and have the ability to work such that they have equal ability to acquire assets and income in the future.

. . . [T]he court heard testimony that the Wife was not given access to the parties' marital funds and that she had difficulty even providing sufficient groceries and necessities to provide for the children even though the defendant was working because she did not have access to these funds. Testimony was heard from Christina Haley, the Wife's aunt, that she often assisted the Wife with groceries and clothes for the children. The Wife's father resided in the garage apartment of the marital home and paid half the mortgage and half the utilities and still the Wife was not provided with sufficient funds to meet the grocery and clothing needs of the children.

. . . [T]he Husband has dissipated the marital estate by concealing, destroying, selling, or transferring a number of marital assets in violation of the statutory injunction that went into place upon the filing of this divorce.

There is no separate property of either party other than the Toyota Corolla purchased by the Husband for his own use and the bedroom furniture purchased by the Wife for her own use after the parties separated.

[Husband] has filed with this court an affidavit of his monthly expenses. However, the court notes here that the financial information he provided on this affidavit is no longer accurate. Since the time of this filing the Husband has moved into the house of his girlfriend and no longer has some of these expenses such as rent and utilities and is no longer the only person buying groceries. The Husband failed to supplement his affidavit following his change of circumstances. The Husband's girlfriend, Becky Runyons, testified that he does not pay rent but that he helps with some of the bills, specifically the cable bill for $170.00, a storage unit for $153.00, $60.00 towards the water bill, and will contribute $100.00 to $150.00 towards groceries per month. This significantly reduces the expenses sworn to by the Husband on his affidavit filed on December 9, 2019.

The Wife is employed by VIP Kids making $1,592.00 per month. The Wife has filed with this court an affidavit of monthly expenses showing her monthly expenses are $2,979.00. Compared to the income and expenses of the Husband, the Wife is in the position of an economically disadvantaged spouse.

[Husband] violated the statutory injunction that went into place upon the filing of the parties' divorce under T.C.A. § 36-4-106(d) [that] enjoins the parties from transferring, assigning, borrowing against, concealing, or in any [way] dissipating or disposing, without the consent of the other party or an order of the court, any marital property. The testimony showed by a preponderance of the evidence that the Husband is guilty of transferring, selling and destroying, and concealing from the Wife certain items of marital property such that he is guilty of dissipating marital assets.

(Headings omitted, paragraphs reformatted, and references to parties changed to "Husband" and "Wife" throughout).

The trial court found that Husband dissipated the marital estate by burning a bed owned by the parties and some outdoor wicker furniture, throwing away their dining room table and an entertainment center, giving away a riding mower and a baby crib, and selling the bed of one of the children. The trial court further found that Husband took and concealed the children's toys and books, the hard drive containing their family photos, and some of Wife's jewelry. Husband denied taking the jewelry, but the trial court heard the conflicting proof on this issue and expressly found Husband's testimony to lack credibility.

Our review of the record in this case confirms that the trial court's determinations are not inconsistent with the statutory factors pertaining to the division of property, nor do they lack proper evidentiary support. Husband argues that the trial court erred in classifying as separate property the Toyota Corolla purchased by the Husband and the bedroom furniture purchased by the Wife after they separated. The trial court awarded Husband the car, which it valued at $7,000, and assigned Husband the corresponding debt of $7,800. Likewise, the court awarded Wife the $1,500 furniture and assigned her the debt of $1,500. As can be seen, there was no equity in either asset at the time of trial. Thus, any classification error had no practical impact on the property division and was entirely minimal. If the trial court had classified these two assets and their corresponding debt as marital as Husband suggests, it would have had no significant impact to either party, but from a purely accounting standpoint, it would arguably only benefit Wife's position by rendering the overall division of property slightly closer to equal.

As already noted, that net division of marital property was roughly 61% to Wife and 39% to Husband. Under the particular facts of this case, we hold that the trial court did not abuse its broad discretion in determining this division to be fair and equitable under the pertinent statutory factors.

7

## B. Alimony in Solido: Wife's Attorney's Fees

Husband challenges the trial court's award of alimony in solido in the form of Wife's attorney's fees of $9,840 and litigation costs of $1,640.70. As our Supreme Court has stated,

> It is well-settled that an award of attorney's fees in a divorce case constitutes alimony in solido. *See* Tenn. Code Ann. § 36–5–121(h)(1) ("alimony in solido may include attorney fees, where appropriate"); *Herrera v. Herrera*, 944 S.W.2d 379, 390 (Tenn. Ct. App. 1996). . . . As with any alimony award, in deciding whether to award attorney's fees as alimony in solido, the trial court should consider the factors enumerated in Tennessee Code Annotated section 36-5-121(i). A spouse with adequate property and income is not entitled to an award of alimony to pay attorney's fees and expenses. *Umstot v. Umstot*, 968 S.W.2d 819, 824 (Tenn. Ct. App. 1997). Such awards are appropriate only when the spouse seeking them lacks sufficient funds to pay his or her own legal expenses, *see Houghland v. Houghland*, 844 S.W.2d 619, 623 (Tenn. Ct. App. 1992), or the spouse would be required to deplete his or her resources in order to pay them, *see Harwell v. Harwell*, 612 S.W.2d 182, 185 (Tenn. Ct. App. 1980). Thus, where the spouse seeking such an award has demonstrated that he or she is financially unable to procure counsel, and where the other spouse has the ability to pay, the court may properly grant an award of attorney's fees as alimony. *See id.* at 185.

*Gonsewski v. Gonsewski*, 350 S.W.3d 99, 113 (Tenn. 2011) (emphasis added). This Court has also held that in making an award of attorney's fees as alimony in solido, "a court must carefully consider the relevant factors set forth in Tenn. Code Ann. § 36-5-121(i)." *Yattoni-Prestwood v. Prestwood*, 397 S.W.3d 583, 597 (Tenn. Ct. App. 2012); *accord Ellis v. Ellis*, 621 S.W.3d 700, 708 (Tenn. Ct. App. 2019).

Our standard of review of the trial court's decision to award alimony is as stated by the Supreme Court:

> For well over a century, Tennessee law has recognized that trial courts should be accorded wide discretion in determining matters of spousal support. This well-established principle still holds true today, with this Court repeatedly and recently observing that trial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award.
>
> Equally well-established is the proposition that a trial court's decision regarding spousal support is factually driven and involves the careful balancing of many factors. *Kinard v. Kinard*, 986 S.W.2d 220, 235 (Tenn.

Ct. App. 1998); *see also Burlew*, 40 S.W.3d at 470; *Robertson v. Robertson*, 76 S.W.3d 337, 340-41 (Tenn. 2002). As a result, "[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal support decision." *Kinard*, 986 S.W.2d at 234. Rather, "[t]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006). Appellate courts decline to second-guess a trial court's decision absent an abuse of discretion. *Robertson*, 76 S.W.3d at 343. An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011); *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010). This standard does not permit an appellate court to substitute its judgment for that of the trial court, but "'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" *Henderson*, 318 S.W.3d at 335 (quoting *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)). Consequently, when reviewing a discretionary decision by the trial court, such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision.

*Gonsewski*, 350 S.W.3d at 105-06 (internal citations and footnote omitted).

A trial court's award of spousal support is governed by Tenn. Code Ann. § 36-5-121(i), which provides:

In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

(3) The duration of the marriage;

(4) The age and mental condition of each party;

(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property, as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

The trial court, applying these factors, found and held as follows in pertinent part:

In this case Husband clearly has the higher earning capacity with his salary from the U.S. Postal Service of $3,772.00 per month compared to Wife's income from VIP Kids of $1,592.00 per month. The court also takes into account that for a portion of the parties' marriage Wife suffered economic detriment for the benefit of the marriage by staying home with the parties' children and being a homemaker and parent as is discussed under T.C.A. §36-5-121(e)(2).

Wife has filed with this court an affidavit of monthly expenses showing her monthly expenses are $2,979.00 which exceed her current income[,] clearly showing to this court that she is in need of some type of spousal support.

\*     \*     \*

[T]his court concludes that Wife is an economically disadvantaged spouse who is in need of spousal support and that Husband has the ability to pay. However, the court finds that Wife is not in need of rehabilitation. The court finds that the more appropriate type of spousal support would be transitional

10

alimony [because Wife] needs assistance to adjust to the economic consequences of a divorce.

However, at the time of this divorce, Wife is already residing with a third person, which raises the presumption that the third person is contributing to the support of Wife and that she does not need alimony, under T.C.A. § 36-5-121(g). Wife presented no proof to negate this presumption. Therefore, for the reasons set forth above the court does not award any amount of transitional alimony.

The last type of alimony that was considered by this court was alimony in solido as set forth in T.C.A. §36-5-121(h). This court hereby orders that the Husband will pay the Wife's attorney fees for this divorce action as alimony in solido.

Husband's failure to pay the parties' bills and bankruptcy during the pendency of the divorce resulted in the repossession of their vehicles and eventual sale of the marital residence. Further, as already noted, the trial court found Husband's stated expenses to be inflated because he was living in his girlfriend's house. Wife, her aunt, and her father all generally testified that she had difficulty making ends meet and providing for the children's needs because of Husband's refusal to allow her access to funds in the marital checking account, among other things.

During the marriage, Wife took care of practically all of the homemaking and parenting duties of the household. At the time of trial, she was homeschooling the children. Husband argues that the trial court erred in determining that she was comparatively economically disadvantaged because Wife was earning a comparable hourly rate to his. Wife worked from home teaching English online to Chinese students. She testified as follows about her work schedule:

A: Currently I work from five in the morning until nine. And then at night I work from 9:30 until midnight.

Q: Can you set your own schedule?

A: Yes. Oh, yes, yes, yes. I'm – yes. I'm an independent contractor through them, so I can set my own schedule. *And I do this so that I can be available to the kids while they're awake. So I'm only working when they're sleeping.*

Q: And how long have you been doing this schedule?

11

A: This – well, when I first started I was just doing mornings. I would work longer on – he had Tuesday and Thursday off back then when I first started, and I would work longer those days. And since the divorce I've been working nights also.

(Emphasis added). According to her testimony, Wife is working days that begin at 5am and end around midnight, taking care of and homeschooling the children during their waking hours and working on both ends of the day. Husband argues that she should not have been awarded spousal support because she is capable of working more hours. The trial court did not agree, and neither do we. We find nothing in our statutory scheme that requires a court to penalize a parent for prioritizing the needs, educational and otherwise, of the children. Wife has demonstrated that she has the need, and Husband the ability to pay, for alimony in solido in the form of her attorney's fees in this matter. We affirm the trial court's spousal support award.

## C. Permanent Parenting Plan

A trial court's decision regarding a parenting schedule is subject to review under the deferential abuse of discretion standard. *C.W.H. v. L.A.S.*, 538 S.W.3d 488, 495 (Tenn. 2017). As the Supreme Court instructed in *C.W.H.*,

> This Court has previously emphasized the *limited* scope of review to be employed by an appellate court in reviewing a trial court's factual determinations in matters involving child custody and parenting plan developments. *Armbrister* [*v. Armbrister*], 414 S.W.3d [685], 692-93 [(Tenn. 2013]. . . . Indeed, trial courts are in a better position to observe the witnesses and assess their credibility; therefore, trial courts enjoy broad discretion in formulating parenting plans. *Id*. at 693 (citing *Massey-Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007)). "Thus, determining the details of parenting plans is 'peculiarly within the broad discretion of the trial judge.' " *Id*. (quoting *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988)). Appellate courts should not overturn a trial court's decision merely because reasonable minds could reach a different conclusion. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001).

*Id*.

A trial court making a custody determination must apply the following analysis provided by Tenn. Code Ann. § 36-6-106:

> (a) In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a

minor child, the determination shall be made on the basis of the best interest of the child. In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors. The court shall consider all relevant factors, including the following, where applicable:

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. . . .

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.[2]

The trial court, applying the statutory factors, made extensive and detailed findings pertinent to each applicable factor, stating as follows:

Wife has performed the majority of the parenting responsibilities relating to the daily needs of the parties' three minor children. Wife continues to be the primary caretaker for the minor children during the pendency of this divorce. Husband did not cook for the children, bathe the children, nor had he ever cared for the children overnight alone before the filing of this divorce action. The testimony showed that Husband was virtually uninvolved with the parties' twins (Paxton and Piper), clearly showing a preference towards interacting with the older child Carolina only. The testimony also shows that Husband was uninvolved with the minor children in comparison with Wife, not attending birthday parties for his own twins, [and] not attending the children's extracurricular activities (basketball/dance).

---

[2] Effective March 18, 2022, the General Assembly amended Tennessee Code Annotated § 36-6-106(a) by adding a sixteenth factor – "Whether a parent has failed to pay court-ordered child support for a period of three (3) years or more." *See* 2022 Tenn. Pub. Acts, Ch. 671 § 1 (H.B. 1866).

[Husband] has previously shown an inability or unwillingness to provide for these minor children, withholding access to marital funds to provide for groceries and clothing for the minor children, such that Wife sought help from her family members to provide for the [needs] of the minor children. In addition, Husband, by not paying the mortgage on the marital home or any car payments, caused both his automobile, as well as the automobile driven by Wife and used to transport the minor children, to be repossessed during the course of this divorce. This court entered an order for the sale of the marital home prior to it being foreclosed upon. Photographs were provided to this court showing that the children have been returned to Wife after visiting with Husband in filthy unwashed clothing and having not been adequately bathed. In addition, the children have been returned to Wife with severe sunburn and with injuries that were not explained to Wife.

Husband, while driving for UBER, took cocaine during the course of the parties' marriage. Husband has told several versions of how many instances that this occurred, but admits to at least one instance. In addition, Husband would drink to excess around the parties' minor children and at family gatherings where his [behavior] was observed by other another witness who testified at trial (Christina Haley). Husband also jumped out of a moving vehicle during an argument with Wife, with the children present in the automobile. . . . The testimony showed that Husband was verbally abusive during the course of the parties' marriage and would damage property during arguments with Wife by kicking doors and punching holes in the walls.

The children have resided in a home shared by the maternal grandfather both currently and during the course of the parties' marriage, as the maternal grandfather lived in the garage apartment of the marital home and shared the expenses of the marital home. Wife currently continues to reside with the minor children in a residence shared with the maternal grandfather. In contrast, the minor children had no relationship with the paternal grandmother prior to the parties' separation when the paternal grandmother moved into the home with Husband to help him care for the children during his visitation time. In fact, Husband and the paternal grandmother did not have a relationship during the course of the parties' marriage.

The children . . . live in a safe, stable and satisfactory environment in the home of Wife. Husband currently resides in the home of his girlfriend, Becky Runyons, and has done so since May 2020. They have no plans to marry. This residence is inhabited by 10 individuals when the children and grandchildren of the girlfriend are present. The home they live in is a five-

15

bedroom home. However, it does appear that the children are provided with adequate sleeping arrangements.

The court did take into consideration what this court believed to be a lack of credibility of Husband as it related to his multiple version of the events around his cocaine use[.] The court also notes here that at no time since the parties' separation has Husband been solely responsible for the care of the parties' minor children. He moved his mother in with him to help care for the children when they were with him and now lives with his girlfriend who assists him in caring for the minor children during his co-parenting time. The paternal grandmother, Lynn Bluder, testified that she was the one who did the grocery shopping, took care of the children's baths, washed their hair, cooked their meals, washed the children's clothes, and helped with exchanges with Wife.

The court also finds that Husband lacked credibility and contradicted his own testimony regarding a number of the children's belongings (toy chest, books, etc.). [He first testified] that he did [not] have these items, and then later correct[ed] his testimony after other [of his] witnesses testified that these items were in his possession.

(Descriptors of parties in original changed to "Husband" and "Wife" throughout).

The testimony and other proof in the record supports the trial court's findings. The parties testified in contradictory ways on numerous points and issues. It is entirely clear that the trial court credited Wife's testimony and not Husband's on these areas of disagreement. Husband admits in his brief that "it is undisputed that the Father was not greatly involved in the children's daily needs prior to the Mother filing for divorce," that "for the majority of the children's lives, the Mother has been the primary caregiver," and "that there was evidence of verbal arguments of the parties that could be construed as abuse prior to the parties' separation." Father does not challenge the factual accuracy of the trial court's findings except for one insignificant matter: he says the court was wrong in finding that Wife began homeschooling the children in March of 2020, when the proof showed that she actually began in August.

Under the facts and circumstances presented here, we find that the trial court did not abuse its discretion in determining that it was in the children's best interest that Husband be granted 90 days per year of co-parenting time. However, the specific day-to-day schedule set forth in the PPP gives him less time. It provides that Husband will have the children from Friday to Sunday every other week; every other Easter, Passover, Memorial Day, and Thanksgiving Day and Friday thereafter; every Father's Day and Husband's birthday; either Christmas Eve or Christmas Day; and one week of vacation time in the

16

summer. The parties do not disagree that this time adds up to about 63 days per year. Because the PPP is inconsistent and irreconcilable in this regard, we vacate the day-to-day schedule and remand to the trial court in order to craft a specific schedule that provides Husband 90 days per year.

### D. Criminal Contempt

The trial court held Husband to be guilty of one count of criminal contempt during the trial, stating as follows:

> This court finds that the defendant in this matter, Aaron L. Burnett[,] is guilty of one count of criminal contempt for his willful misbehavior in the presence of this court or so near thereto as to obstruct the administration of justice and that the defendant willfully disobeyed this court['s] instruction and commands to not discuss this case with any of the witness[es] waiting to testify in this matter who were instructed to wait outside the courtroom by this Honorable Judge. During a break, the Defendant was overheard by an officer of the court discussing the proof of the case with his waiting witness, Lynn Bluder. This also constitutes unlawful interference with the proceedings of this court. Therefore the defendant is found guilty of one count of criminal contempt and charged a fine of $50.00.

The contempt finding was based on a single statement that was overheard by the court officer and relayed to the trial court. The officer heard a potential witness say to Husband, "how is she going to prove that?" during a mid-morning break of the trial.

The trial court found Husband guilty of violating the sequestration rule, Tennessee Rule of Evidence 615, often referred to in shorthand as simply "the Rule," which provides that "[a]t the request of a party the court shall order witnesses [to be] excluded at trial or other adjudicatory hearing. . . . The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness." Husband and the potential witness denied discussing any testimony outside of court. Husband also argues that the alleged violation took place during the mid-morning break, and that "it wasn't until the lunch break that that the Chancellor told the parties that they were not supposed to discuss the testimony or exhibits presented in court with witnesses." At oral argument, counsel for Wife conceded that the criminal contempt finding was improperly made by the trial court. Consequently, we reverse the trial court's holding of Husband in criminal contempt.

## V. CONCLUSION

The day-to-day visitation schedule in the permanent parenting plan is vacated, and the case remanded to the trial court with instructions to craft a schedule that allows Husband 90 days per year. Husband's conviction of one count of criminal contempt is reversed. The trial court's judgment is in all other respects affirmed. Costs on appeal are assessed to the appellant, Aaron Burnett, for which execution may enter if necessary.

_____
KRISTI M. DAVIS, JUDGE